# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| LUCILLE ANDERSON, SARA ALAMI, GIANELLA CONTRERAS CHAVEZ, DSCC, and DEMOCRATIC PARTY OF GEORGIA, INC., | Civil Action No. 1:20-cv-03263-MLB |
| Plaintiffs, | |
| v. | |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and the Chair of the Georgia State Election Board; REBECCA N. SULLIVAN, DAVID J. WORLEY, MATTHEW MASHBURN, and ANH LE, in their official capacities as Members of the Georgia State Election Board; MARY CAROLE COONEY, MARK WINGATE, VERNETTA NURIDDIN, KATHLEEN RUTH, and AARON JOHNSON, in their official capacities as Members of the FULTON County Board of Registration and Elections; SAMUEL E. TILLMAN, ANTHONY LEWIS, SUSAN MOTTER, DELE LOWMAN SMITH, and BAOKY N. VU, in their official capacities as Members of the DEKALB County Board of Registration and Elections; PHIL DANIELL, FRED AIKEN, JESSICA M. BROOKS, NEERA BAHL, and DARRYL O. WILSON, JR., in their official capacities as Members of the COBB County Board of Elections and Registration; JOHN MANGANO, BEN SATTERFIELD, WANDY TAYLOR, STEPHEN DAY, and | |

ALICE O'LENICK, in their official
capacities as Members of the GWINNETT
County Board of Registrations and
Elections; THOMAS MAHONEY III,
MARIANNE HEIMES, MALINDA
HODGE, ANTWAN LANG, and DEBBIE
RAUERS, in their official capacities as
Members of the CHATHAM County Board
of Elections; CAROL WESLEY,
DOROTHY FOSTER HALL, PATRICIA
PULLAR, DARLENE JOHNSON, and
DIANE GIVENS, in their official capacities
as Members of the CLAYTON County
Board of Elections and Registrations;
DONNA CRUMBLEY, DONNA MORRIS-
MCBRIDE, ANDY CALLAWAY, ARCH
BROWN, and MILDRED SCHMELZ, in
their official capacities as Members of the
HENRY County Board of Elections and
Registration; MYESHA GOOD, DAVID C.
FEDACK, ROBERT PROCTOR, DANIEL
ZIMMERMANN, and MAURICE HURRY,
in their official capacities as Members of the
DOUGLAS County Board of Elections and
Registration; and RINDA WILSON,
HENRY FICKLIN, HERBERT
SPANGLER, CASSANDRA POWELL,
and MIKE KAPLAN, in their official
capacities as members of the MACON-
BIBB County Board of Elections,

        Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ........................................................................1

II. BACKGROUND ........................................................................2

    A. Georgia's Recent History is Replete with Voters Facing Long Lines ...................................................................................2

    B. Defendants are responsible for appropriately resourcing polling locations.................................................................................6

    C. Defendants' failures to allocate sufficient resources cause Georgia's long lines.................................................................8

    D. Defendants have perpetually failed to address their systemic under-resourcing of polling places....................................15

III. ARGUMENT.............................................................................16

    A. Plaintiffs are highly likely to succeed on the merits of their claims.................................................................................17

        1. Defendants' systemically poor election administration and long lines severely burden the right to vote. ....................17

        2. Long lines in Georgia treat similarly situated voters differently in violation of the Equal Protection Clause. ..........20

        3. No state interest justifies the long lines. ................................21

        4. Long lines in Georgia violate the Due Process Clause...........22

    B. Plaintiffs will suffer irreparable harm absent an injunction..............23

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Burdick v. Takushi*,
504 U.S. 428 (1992)..................................................................17

*Bush v. Gore*,
531 U.S. 98 (2000)...................................................................20

*Carillon Imps., Ltd. v. Frank Pesce Int'l Grp., Ltd.*,
112 F.3d 1125 (11th Cir. 1997) ...........................................16

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..................................................................20

*Corby v. Scranton Housing Authority*,
2005 WL 6789319 (M.D. Pa. June 7, 2005).......................25

*Crawford v. Marion Cty. Election Bd.*,
553 U.S. 181 (2008)..................................................................18

*Curling v. Raffensperger*,
397 F.Supp.3d 1334 (N.D. Ga. 2019)...................................24

*Democratic Exec. Comm. of Fla. v. Lee*,
915 F.3d 1312 (11th Cir. 2019) ...........................................25

*Fla. State Conference of NAACP v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ...........................................20

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
347 F. Supp. 3d 1251 (N.D. Ga. 2018)...................19, 22, 24, 25

*League of Women Voters of Fla., Inc., v. Detzner*,
314 F. Supp. 3d 1205 (N.D. Fla. 2018) ...............................19

*League of Women Voters of North Carolina v. North Carolina*,
769 F.3d 224 (4th Cir. 2014) ...............................................24

ii

*League of Women Voters of Ohio v. Brunner*,
548 F.3d 463 (6th Cir. 2008) ........................................................................18, 23

*Martin v. Kemp*,
341 F. Supp. 3d 1326 (N.D. Ga. 2018) ..............................................................24

*NAACP State Conference of Pa. v. Cortés*,
591 F. Supp. 2d 757 (E.D. Pa. 2008) ....................................................2, 18, 19

*Ne. Ohio Coal. for the Homeless v. Husted*,
696 F.3d 580 (6th Cir. 2012) .......................................................................21, 23

*Norman v. Reed*,
502 U.S. 279 (1992) .....................................................................................17, 22

*Obama for America v. Husted*,
697 F.3d 423 (6th Cir. 2012) ..............................................................................20

*Taylor v. Louisiana.*,
419 U.S. 522 (1975) ............................................................................................22

*United States v. Georgia*,
892 F. Supp. 2d 1367 (N.D. Ga. 2012) ..............................................................25

*Ury v. Santee*,
303 F. Supp. 119 (N.D. Ill. 1969) ......................................................................21

*Warf v. Bd. of Elections of Green Cty., Ky.*,
619 F.3d 553 (6th Cir. 2010) ..............................................................................23

*Wexler v. Anderson*,
452 F.3d 1226 (11th Cir. 2006) ..........................................................................21

## STATUTES

O.C.G.A. § 21-2-31 ...............................................................................................6

O.C.G.A. § 21-2-40 ...............................................................................................7

O.C.G.A. § 21-2-40(a) ........................................................................................14

iii

O.C.G.A. § 21-2-50 .................................................................................6

O.C.G.A. § 21-2-50(a)(1) .........................................................................7

O.C.G.A. § 21-2-50(a)(5), (11) ................................................................7

O.C.G.A. § 21-2-70 .................................................................................7

O.C.G.A. § 21-2-300(a) ...........................................................................6

O.C.G.A. § 21-2-300(c) ........................................................................7, 8

O.C.G.A. § 21-2-300(d) ...........................................................................7

**OTHER AUTHORITIES**

Ga. Comp. R. & Regs. 183-1-12-11(2)(c)-(d) ........................................13

https://covid.cdc.gov/covid-data-tracker/#cases (last visited Aug. 31,
    2020) ................................................................................................15

U.S. Const. amend. I ..............................................................................17

U.S. Const. amend. XIV .........................................................................17

U.S. Const. amend. XIV, § 1 ...................................................................20

LEGAL149237690.3

## I.    INTRODUCTION

On June 9, 2020, Georgia's election system experienced a complete meltdown. The last voters in the June Primary cast their votes after 1:00 a.m.—over six hours after the polls were scheduled to close. Some voters, like Plaintiff Gianella Contreras Chavez, waited for up to eight hours in the extreme heat and well into the night simply to cast their votes; others like Plaintiff Lucille Anderson, who returned to the line multiple times, ultimately could not wait and were disenfranchised. The June Primary was only the most recent election in which voters were burdened and even disenfranchised by excessively long lines in Georgia's elections. For over a decade, Georgia voters have had to wait in lines significantly longer than the national average—which is currently only ten minutes—and exponentially longer than the 30-minute cutoff recommended by the Presidential Commission on Election Administration ("Commission).[1] Ex. 64 (76% of polling locations had wait times of 10 minutes or less and 92% had wait times of 30 minutes or less); Ex. 65 ("*The Commission has concluded that, as a general rule, no voter should have to wait more than half an hour in order to have an opportunity to vote.*"). And voters in the State's

---

[1] All references to exhibits refer to the Declaration of Amanda J. Beane in Support of Plaintiffs' Motion for Preliminary Injunction.

urban and minority communities frequently encounter exceptionally long lines while voters in suburban and predominantly white communities do not.

"[T]here can come a point when the burden of standing in a queue ceases to be an inconvenience or annoyance and becomes a constitutional violation because it, in effect, denies a person the right to exercise his or her franchise." *NAACP State Conference of Pa. v. Cortés*, 591 F. Supp. 2d 757, 764 (E.D. Pa. 2008). Defendants have well-exceeded that point for over a decade now due to their systemically poor administration of elections, which has repeatedly caused long lines at the polls, deterring and disenfranchising Georgia voters. It has become clear that nothing will change without judicial compulsion: the Court must order preliminary relief so that Defendants remedy their systematic election problems and Georgia voters no longer wait longer than anyone else in the country, so that they do not have to choose between their school, their work, their child care, or—in this coming election, in particular—their health, *just to vote*.

## II.     BACKGROUND

## A.     Georgia's Recent History is Replete with Voters Facing Long Lines

Since at least 2008, Georgia voters have faced some of the longest average

voting wait times in the country, often waiting hours to vote.[2] A more detailed history is contained in the report of Dr. Jonathan Rodden, a tenured Professor of Political Science at Stanford University, and summarized here. According to the Cooperative Congressional election study, Georgia was in the middle of the pack among U.S. states for wait times in the general elections in 2008 and 2012, although that meant that many Georgia voters waited over an hour to vote in the 2012 general election, *see* Ex. 4, well over the 30-minute average wait time recommended by the Commission.[3] Ex. 61 at 24. By 2014, however, Georgia was one of the states with the longest average wait times in the country.[4] Ex. 61 at 25. And by 2018, Georgia had **the** longest voting wait times in the entire country. Ex. 61 at 25 (citing Bipartisan Policy Center Study).[5] Wait times increased more dramatically in Georgia than in

---

[2] Ex. 2 (wait times up to 10 hours in Atlanta and dozens of DeKalb polling locations averaging 3-hour waits in 2008); Ex. 3 (6-hour lines in Clayton County in 2008).

[3] The American Voting Experience: Report and Recommendations of the Presidential Commission on Election Administration, *supra* at n. 3.

[4] *See also* Ex. 7 (Fulton County polling locations ordered to stay open late in 2014). By 2016, voters reported waiting in line to vote for up to five hours. Ex. 9 (long lines reported in Fulton and DeKalb Counties); Ex. 28; (3-hour wait times in Cobb County); Ex. 5 (5-hour wait times and lines with up to 400 people in Gwinnett County); Ex. 21 (long lines in Macon-Bibb County).

[5] *See also* Ex. 8 (Fulton County polling locations ordered to stay open late because of long lines in 2018); Ex. 10 (2-hour wait times in Fulton and DeKalb Counties); Ex. 11 (long lines in Gwinnett County because of lack of power cords, machine failures, and technical issues); Ex. 14 (3-hour wait times in Chatham County); Ex. 19 (long lines in Clayton County). Ex. 22 (long lines in Macon-Bibb County).

LEGAL149237690.3

any other state between 2014 and 2018. Ex. 61 at 25. As a direct result, polling locations have been ordered to stay open late *in nearly every election since 2014*. *See, e.g.,* Ex. 7 (2014), Ex. 45 (2017); Exs. 8, 49, 50 (2018); Ex. 41 (2019); Exs. 42, 43, 44, 46, 47, 48, 51, 52, 53, 54, 55, 56, 57, 58 (2020).

Despite having *years* to fix this problem, Defendants have not. Wait times only increased during the June Primary when the nation witnessed voters waiting in extraordinarily long lines across the state, with some waiting for up to eight hours to vote. *See, e.g.*, Ex. 1, Ex. 31 at ¶¶ 5-7, Ex. 32 at ¶¶ 3-7, Ex. 33 at ¶ 18, Ex. 34 at ¶¶ 5-9, Ex. 35 at ¶¶ 6-18. Courts again ordered polling places to stay open late in multiple counties to avoid disenfranchising voters. *See, e.g.,* Ex. 42 (Chatham); Ex. 43 (Cherokee); Ex. 44 (Cobb); Ex. 46, Ex. 47 (DeKalb); Exs. 20, 48 (Douglas); Ex. 57 (Fulton); Ex. 52 (Henry); Ex. 53 (Lamar); Ex. 54 (Laurens); Ex. 55 (Liberty); Ex. 56 (Pickens); Ex. 57 (Bartow); Ex. 58 (Morgan). Hours-long wait times were reported in the Counties.[6] *see, e.g.*, Ex. 32 at ¶¶ 3-7 (Cobb: 8 hours); Ex. 35 at ¶¶ 10-18 (Fulton: 7 hours); Ex. 36 at ¶¶ 3-10 (DeKalb: 4.5 hours); Exs. 12-13, 17; Ex. 40 (Clayton: 3 hours); Ex. 23; Exs. 41, 42 (Henry: 3 hours). Thousands of voters

---

[6] The term "Counties" refers to the Georgia counties that are the subject of this lawsuit: Fulton, DeKalb, Cobb, Gwinnett, Clayton, Chatham, Douglas, Henry, and Macon-Bibb Counties.

4

waited outside in the extreme heat, humidity, and rain. Ex. 31 at ¶¶ 5-7, Ex. 34 at ¶¶ 8-9, Ex 35 at ¶ 12; Ex. 38 at ¶ 9. Many were forced to leave as conditions worsened, *see e.g.* Ex. 36 at ¶¶ 6-9 (DeKalb: 100 voters, *i.e.* two-thirds of the line, left during four-hour wait); *see also* Ex. 38 at ¶ 9; Ex. 17, or because of work schedules, health concerns, and other commitments. Exs. 31, 37; *see also* Exs. 67-113.

These long lines were not distributed equally in Georgia. Minority communities—and particularly those in the Counties named together with the Secretary as Defendants in this action—experienced long lines and disenfranchisement, while suburban, white and rural communities generally did not. Ex. 61 at 3. The disparities are striking:

> Among polling places where minorities made up over 90% of registered voters, 36% were forced to stay open over one hour past the specified closing time in order to accommodate long lines. In the Atlanta metro area, 45% of such polling places were forced to do so. Among polling places where whites made up over 90% of registered voters, less than 3% of polling places were required to stay open late in order to accommodate long lines. In polling places where minorities constituted more than 90% of active registered voters, the average minimum wait time in the evening was 51 minutes. When whites constituted more than 90% of registered voters, the average was around six minutes.

*Id*.

The burdens and effects of long lines extend well beyond election day. As Dr. Rodden explains, the longer a voter has to wait in line, the more they start to lose

LEGAL149237690.3

confidence that their vote will be counted. *Id.* at 14-15. Long lines cause the electorate as a whole—not just those who personally wait in a long line—to lose confidence in the election's accuracy. Troublingly, voters who waited in or witnessed long lines during the June Primary expressed doubts as to whether votes had been accurately counted. *See e.g.*, Ex. 33 at ¶ 10, Ex. 39 at ¶¶15-17.

**B.     Defendants are responsible for appropriately resourcing polling locations.**

Defendants have clear legal obligations to resource elections. As the chief elections officer, the Secretary has the responsibility to manage Georgia's election system and proscribe uniform procedures. O.C.G.A. § 21-2-50, *see also* Ex. 66 at 19. The Secretary chairs the Georgia State Election Board ("Board"), which is responsible for ensuring uniform election processes across the state. O.C.G.A. § 21-2-31, *see also* Ex. 66 at 19. Both the Secretary and the Board (collectively "State Defendants") have "significant statutory authority to train election officials and set election standards." Ex. 66 at 19 (citing O.C.G.A. §§ 21-2-31, 21-2-50(b). The Secretary's specific responsibilities include allocating voting equipment to each county, O.C.G.A. § 21-2-300(a); training county elections officials and furnishing them with materials needed for elections, O.C.G.A. § 21-2-50(a)(5), (11); developing and implementing a program "to educate voters, election officials, and

6

poll workers in the proper use of such voting equipment." O.C.G.A. § 21-2-300(d). He is also responsible for preparing and distributing election materials, such as ballots and election forms, O.C.G.A. § 21-2-50(a)(1), and is empowered to provide the counties with sufficient emergency paper ballots in the highly foreseeable event of voting machine or equipment failures. The Secretary may promulgate rules for the set up and installation of voting machines, *see* O.C.G.A. § 21-2-300(c). For example, he has instructed poll managers to *prohibit* poll workers from operating or even plugging in voting machines prior to election day, Ex. 39, and could appropriately modify this rule as necessary.

The Counties' boards of election and registration ("County Defendants") are responsible for the day-to-day operations of running elections, Ex. 66 at 20, including to: (1) select and equip polling places; (2) appoint poll officers; (3) make and issue rules and instructions for poll officers, custodians, and electors; (4) instruct poll officers in their duties; and (5) systematically and thoroughly inspect the conduct of elections in the county's precincts to ensure that elections are honestly, efficiently, and uniformly conducted. *See* O.C.G.A. §§ 21-2-40, 21-2-70. In addition, each county is responsible for providing or contracting for adequate technical support for the "installation, set up, and operation of" voting equipment. O.C.G.A. § 21-2-300(c). Thus, in addition to properly training poll workers, the

7

Counties should ensure that each polling location has adequate technical support.

## C. Defendants' failures to allocate sufficient resources cause Georgia's long lines.

Plaintiffs' experts confirm an unsurprising fact: Georgia's long voting lines are caused by insufficient and inefficient resource allocation, all due to Defendants' failures to fulfill their obligations as described above.[7] That said, Plaintiffs' experts also provide a clear and simple solution: they demonstrate, using voting data and resource capabilities, how providing adequate and properly allocated resources can dramatically reduce long voting lines in November.

***Number of voters at polling locations***. The Counties are using polling locations serving numbers of voters well over the national average, Ex. 61 at 41-51, and have been for years. *Id.*at 18-24. Over the last decade, Georgia's population has grown substantially—especially in the Atlanta metro area—while the number of polling places has been *decreasing*. *Id.* at 43. As a result, some polling locations in

---

[7] Due to resistance and delays by Defendants in providing underlying data, Plaintiffs' experts were only able to offer opinions as to certain counties. Plaintiffs will supplement their expert reports as needed when they receive data from other counties. Plaintiffs highlight specific examples of problems here, and otherwise refer to and incorporate their expert reports, Exs. 61 and 62, for a more complete view of the problems in each county.

8

Georgia serve unusually large numbers of voters, especially in minority communities, and many serve multiple precincts.

According to the Election Assistance Commission, the overall average of registered voters per polling station in the United States was 1,547 in 2016. Ex. 61 at 43. In Georgia in June of 2020 it was almost twice as large: 3,046. *Id.* at 47. As of 2016, 48% of states had less than 1,000 registered voters per polling place on average, but, as of June 2020, only 15% of Georgia polling places were beneath this threshold. *Id.* at 42-43. More than a third—42%—of Georgia polling locations serve over 3,000 voters. *Id.* at 43. Of these, 316 serve over 5,000 and 35 serve over 10,000 voters. *Id.* During the June Primary, five precincts in Fulton County were consolidated so that a *single* polling location—Park Tavern—had to serve *16,000 voters*. Ex. 1. At least five polling locations in Fulton County served over 10,000 voters, with one location serving 16,000. Ex. 60 at ¶ 14. And while 7% of polling places that serve a *single* precinct checked in voters after 8 p.m., a staggering 52% of polling places serving *multiple* precincts did so. Ex. 61 at 47-48.

Stark racial disparities are clear here, too. For the June Primary, 32% of Georgia's polling places served a population where the majority of voters assigned to the polling place were minorities, but of polling places serving multiple precincts, 44% were minority-majority. Ex. 61 at 54.

9

In the June Primary, polling locations were further overburdened because of COVID-19 related concerns. Many precincts had to find new polling locations at the last minute. Ex. 25 For example, Fulton County lost 40 polling locations. *Id.*

***Inefficient/Insufficient Resource Allocation***. Dr. Muer Yang, an associate professor in the Department of Operations and Supply Chain Management, Opus College of Business, University of St. Thomas, shows that Defendants are not supporting these overloaded polling places appropriately, and that even minor changes in resource allocation could improve lines significantly. Ex. 62 at 52-55.

As background, Georgia utilizes a three-stage voting system: first, a poll worker using a poll pad will check the voter in; second, the voter casts his ballot using a voting machine (BMD), which will then print out the voter's completed ballot; and third, the voter deposits the printed ballot into a scanner. Ex. 62 at 10. Long lines form when there is an insufficient amount of any one of these items (poll pads, voting machines, or scanners) for the number of voters present at any given time. Where there are more voters, more poll pads, voting machines, and scanners are needed. And in each instance, the number of technicians needed to keep equipment operating throughout the day must be commensurate to the number of poll pads, voting machines, and scanners deployed. *See generally*, Ex. 62 at 52-54.

10

The field of study that focuses on reducing wait times in lines has developed well-established methods to achieve wait reductions, one of which is optimized resource allocation. *See* Ex. 62 at 6-9. Yet, Georgia has perpetually failed at appropriate resource allocation. In the June Primary, voting machines were distributed without properly accounting for the number of voters that each polling location actually serves. Ex. 62 at 22-23, 27-28. Consequently, and predictably, polling locations serving large numbers of voters were again woefully underequipped. *Id.* State Defendants reportedly provided most polling locations with only one scanner, regardless of number of voters. Ex. 1. On the other hand, some polling locations received more voting machines than they could possibly use. Ex. 39 at ¶ 7 (5 voting machines and 5 printers placed in closet at polling location).

What makes this perpetual failure more egregious is the ease with which it is remedied. Dr. Yang found that if counties had simply re-allocated *existing* voting machines to correspond with the distribution of voters—a common-sense approach that would have been simple to implement—wait times would have been drastically reduced. Ex. 62 at 21-22, 32-35. For example, in Henry County, where wait times extended to over two hours, a reallocation of the available voting machines (increasing them at some locations while decreasing them at others) would have resulted in an estimated average wait time of no more than four minutes at any

11

polling location, and, at the high end, no voter would have waited more than 30 minutes. Ex. 62 at 20-21.

Another problem was the State's failure to deploy adequate technicians. There were countless technical issues throughout the state. *See e.g.* Exs. 5, 12, 18, 24; Ex. 31 at ¶ 7; Ex. 35, ¶¶ 21-25 (Fulton: inoperable voting machines and bottlenecks at voter check-in); Ex. 39 at ¶ 10 (Cobb: no operational voting machines when polls opened); Ex. 40 at ¶¶ 3-13 (Clayton: no operational voting machines for nearly four hours). Nevertheless, the State deployed little more than one technician per county. Ex. 1. For example, at Park Tavern, a polling location in Fulton County, the average voter wait time was 94 minutes. Ex. 62 at 31. Dr. Yang estimates that, if machines had been properly maintained and operational, wait times there would have been cut by more than one third. Ex. 62 at 31-32. Technical malfunctions were rampant across the Counties with insufficient technicians to help.[8]

Dr. Yang also found that a sufficient supply of paper ballots or paper poll books is a simple way to mitigate delay—and the consequent long lines—caused by

---

[8] *See, e.g.*, Ex. 36 (Fulton: 4-hour delay because check-in machines not working); Ex. 40 (Clayton: no voting machines working when polls opened); Ex. 17 (Chatham: voting machines not working and other technical issues across the county); Ex. 23 (Macon-Bibb: delays caused by issues with setting up voting machines); Exs. 1 and 26 (polling locations did not have power sources compatible with voting machine wattage); Ex. 62 at 37 (Douglas: hour-long lines due to technical or human errors).

malfunctioning poll pads or voting machines. Ex. 62 at 37, 54. However, counties failed to adequately supply these. *See, e.g.*, Ex. 36 at ¶ 6; Ex. 40 (polling place with inoperable voting machines lacked Democratic provisional ballots); Ex. 36 at ¶ 6. Dr. Yang recommends clear guidance that paper ballots be used once the last voter in line is going to have to wait longer than 30 minutes. Ex. 62 at 55-56. This recommendation is consistent with Georgia law, which allows superintendents to issue paper ballots when wait times exceed 30 minutes. Ga. Comp. R. & Regs. 183-1-12-11(2)(c)-(d). This guidance was not uniformly followed during the primary as wait times, as many voters waited in line for hours without ever having moved. *See e.g.* Ex. 36 at ¶¶ 6-9 (line did not move for almost four hours because voting machines not working); Ex. 37 at ¶¶ 4-5 (polls did not open until 9:00 a.m. because voting machines not working).

To further compound these problems, polling locations were provided with inadequate training on how to use the voting equipment. Ex. 1, Ex. 19 (Clayton: polling location staffed with 2 workers), Ex. 35, ¶ 25 (Fulton polling place understaffed). Poll managers had no hands-on experience with the new voting machines and would not allow poll workers—whose only training had been to watch a poorly executed YouTube video—to test the equipment, turn it on, or otherwise familiarize themselves with it prior to election day. Ex. 39 at ¶¶ 3-9. Poll workers

13

also received conflicting directions—which changed throughout the day—on what to do if a voter had requested an absentee ballot; no written directions were ever provided. Ex. 39 at ¶ 12. It is common sense that poll workers must be provided with adequate training in order to avoid delays.  *See* Ex. 62 at 33, 53.

**D.      Defendants have consistently failed to address their systemic under-resourcing of polling places.**

The June Primary saw record voter turnout, with nearly 2.4 million voters participating in the election. Ex. 59. According to the Secretary, voter turnout for the general election in November could reach *5 million*. *Id.* In other words, polling locations that were far beyond capacity for the June Primary will be expected to serve at least twice as many voters in November.

The risk of long lines and disenfranchisement is especially high in the context of the current pandemic.[9] During the June Primary, many polling locations cancelled shortly before the election, as did hundreds of poll workers, because of COVID-19 related concerns. *See, e.g.*, DPG Dec. ¶ 11. Ten percent of polling locations were relocated, with the greater Atlanta area losing nearly 80 polling places. Ex. 60 at ¶ 14. In November, too, overburdened and understaffed precincts will likely have to

---

[9] Georgia is currently fourth in the nation for highest number of COVID-19 cases, with 268,973 total cases as of August 31, 2020. *See* https://covid.cdc.gov/covid-data-tracker/#cases (last visited Aug. 31, 2020).

14

be combined at the last minute. *See e.g.*, Ex. 1.

The general election is less than three months away, but Defendants have not taken sufficient, concrete action to ensure that November is not a repeat of the June Primary. Nor do years of increasing long lines indicate that Defendants can or will implement sufficient measures to address the turnout expected in November. The message to the public has been confusing, alternating between the State and Counties pointing the finger at one another—with the Secretary claiming "this all lays" on the Counties and the Counties claiming "the buck stops" with the Secretary—and Defendants purport to be "working together to come up with unique solutions to voting in a pandemic," Exs. 1, 59, but Defendants have not informed the public of any concrete actions they are taking to prevent and remedy long lines. Preliminary injunctive relief is essential.

## III.   ARGUMENT

The Court should grant preliminary relief because: (1) Plaintiffs are highly likely to succeed on the merits of their claims; (2) they will suffer irreparable harm without one; (3) that harm outweighs any injury Defendants will suffer because of an injunction; and (4) an injunction is in the public interest. *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp., Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997).

15

**A.      Plaintiffs are highly likely to succeed on the merits of their claims.**

**1.      Defendants' systemically poor election administration and long lines severely burden the right to vote.**

Plaintiffs are highly likely to prevail on their claims that Defendants' failures to remedy systematic long lines violate the U.S. Constitution. When an election law is challenged under the First and Fourteenth Amendments, courts apply the *Anderson-Burdick* balancing test, under which the Court "weigh[s] 'the character and magnitude of the asserted injury to the rights . . . the plaintiff seeks to vindicate' against the 'precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 780 (1983)).

The standard is "flexible," with the rigorousness of scrutiny dependent upon the extent to which the law burdens voting rights. *Id.* When those rights are subject to "severe" restrictions, laws "must be narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. 279, 289 (1992). But even less severe burdens remain subject to balancing: "[h]owever slight" the burden on voting rights may appear, "it must be justified by relevant and legitimate state interest 'sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election*

16

*Bd.*, 553 U.S. 181, 191 (2008) (controlling op.) (quoting *Norman*, 502 U.S. at 288-89).

Long lines systematically repeated for years, resulting in wait times of multiple hours across the state, go beyond mere issues of election administration that otherwise might call for deference to Defendants. Courts have recognized that where long lines are pervasive and systematic, and where the government refuses to act to fix the problems, long lines are an unconstitutional burden on the right to vote, worthy of court intervention. *Cortés*, 591 F. Supp. 2d at 765 (noting "[h]istory is our guide" and relying on evidence from past elections in determining there was a "real danger" of machine malfunction "likely to cause unacceptably long lines" on election day); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (allegations of long lines, and of longer lines in some counties than in other counties, could state an equal protection claim).

And Georgia presents a particularly stark example of the problem. Lines longer than even 30 minutes can and do result in disenfranchisement. But in recent elections, Georgia voters suffered in lines that lasted up to eight hours, with the last voter casting their ballot at 1:00 a.m. That is a travesty under *any* circumstance but it falls particularly hard on working voters. Many simply cannot afford these wait times and, indeed, countless voters left the lines in the June Primary as a result of

17

significant wait times. Ex. 61, 14-16, 69; *see also, e.g.*, Ex. 36 at ¶¶ 6-9, Ex. 38 at ¶ 9, Ex. 40 at ¶ 6.

A burden on the right to vote that results in disenfranchisement is, at the risk of stating the obvious, a severe burden. *See, e.g.*, *NGP, et al. v. Raffensperger*, No. 1:20-cv-1986, *slip op.* 57-58 (N.D. Ga. Aug. 31, 2020) (finding repeated disenfranchisement of thousands of Georgia voters due to Defendants' poor administration of elections severe); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1264 (N.D. Ga. 2018) (finding severe burden where 3,141 individuals would have been disenfranchised). Regardless, total disenfranchisement is not needed to find a severe burden——it is enough that right to vote is burdened, as it is here, with hours needed to cast one's ballot. *Cortés*, 591 F. Supp. 2d at 765 ("The delay resulting from a situation where 50% or more of the voting machines are inoperable will unduly burden and thus deprive many citizens of their right to vote.").

And, worse, the burden is far from equally distributed. Dr. Rodden confirmed what even a casual observer would notice: there are significant racial disparities when it comes to who is standing in long lines in Georgia. Ex. 61 at 3, 36-38. In polling places where minorities constituted 90% of voters, the average minimum wait time in the evening was 51 minutes. *Id.* But when whites constituted 90% of

18

voters, the average was merely 6 minutes. *Id.* This is a staggering difference. And long lines are especially hard on low-income and minority voters, who often work as shift laborers with unforgiving schedules and difficult child care arrangements. "Disparate impact matters under *Anderson-Burdick*." *League of Women Voters of Fla., Inc., v. Detzner*, 314 F. Supp. 3d 1205, 1216 (N.D. Fla. 2018) (citing *Crawford*).

### 2. Long lines in Georgia treat similarly situated voters differently in violation of the Equal Protection Clause.

The Equal Protection Clause prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. Const. Amend. XIV, § 1. It requires that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). The Equal Protection Clause's protections extend to voting. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000). "When a state adopts an electoral system, the Equal Protection Clause . . . guarantees qualified voters a substantive right to participate *equally* with other qualified voters in the electoral process. *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1185 (11th Cir. 2008) (citations omitted). The *Anderson-Burdick* standard

applies to Equal Protection claims based on disparate burdens on the right to vote. *Obama for America v. Husted*, 697 F.3d 423, 430 (6th Cir. 2012).

The Defendants' continued failure to prevent or remedy extremely long lines at polling locations within the Georgia Counties as compared to other counties or between polling locations within a single county imposes widely different burdens on voters across the State and within counties in violation of equal protection. *See* Ex. 62, 18-19 (showing highly disparate wait times within one county), 24 (showing almost non-existent wait times in Athens-Clarke county, which stands in contrast to the Georgia Counties).

And, as discussed above, the racial disparity is also stark, with waiting times significantly longer at locations serving mostly minority populations as compared to white voters. Ex. 61 at 3, 36-38. Further, polling places serving a majority of minority voters having hundreds more active voters assigned as compared to polling places serving a majority of white voters. Ex. 61 at 50-51.

This disparate allocation of resources among the state and within the counties, as well as the significant racial disparity, constitutes a violation of equal protection. *See Ury v. Santee*, 303 F. Supp. 119 (N.D. Ill. 1969) (failure to provide "substantially equal voting facilities" violated equal protection); *Wexler v. Anderson*, 452 F.3d 1226, 1231–32 (11th Cir. 2006) (finding a non-uniform voting practice that makes

20

it "less likely" a person in one county will "cast an effective vote" than a voter in another county is a question "of constitutional dimension"); *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 598 (6th Cir. 2012) (plaintiff may state equal-protection claim by alleging lack of statewide standards results in a system that deprives citizens of the right to vote based on where they live).

### 3.    No state interest justifies the long lines.

Forcing voters to wait in long lines to cast a ballot imposes severe restrictions on the right to vote and are therefore subject to strict scrutiny. *Norman*, 502 U.S. at 289; *see* Ex. 61 at 13-14 (citing evidence that long lines deter voters and leads to lower voter turnout). But whether subject to strict scrutiny or something less, neither the State nor the Counties have any legitimate interest in failing to implement the changes that would cure these lines, let alone an "interest of compelling importance," and therefore their failures to remedy the long lines do not withstand any level of scrutiny. *Id.* Indeed, *it is their very job to do so*. *See* Section B, *supra*.

After over a decade of Georgia steadily climbing to set the record for longest wait times in the country, no administrative burden can justify Defendants' refusal to remedy the long lines. *See, e.g.*, *Taylor v. Louisiana.*, 419 U.S. 522, 535 (1975) (holding "administrative convenience" cannot justify practices that impinge upon fundamental rights); *Georgia Coalition*, 347 F. Supp. 3d at 1268 (holding increased

21

administrative burden "is minimal compared to the potential loss of a right to vote"). As Dr. Yang's report makes clear, even *slight tweaks* in resource allocation could substantially reduce wait times to vote. Ex. 62 at 51-52. For example, wait times would be much shorter if election officials simply accounted for the number of voters served by each polling location and allocating machines based on the expected turnout. *Id.*

### 4.    Long lines in Georgia violate the Due Process Clause.

"The Due Process Clause protects against extraordinary voting restrictions that render the Voting System 'fundamentally unfair.'" *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 597 (6th Cir. 2012); *see also Warf v. Bd. of Elections of Green Cty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010). "[S]ubstantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they 'result in significant disenfranchisement and vote dilution[.]'" *Husted*, 696 F.3d at 597; *see also Warf*, 619 F.3d at 559.

Defendants have buried their heads in the sand as wait times to vote have increased to the point where Georgia now has the longest waits in the country, resulting in significant disenfranchisement of Georgia voters for over a decade. This renders the failure to remedy long lines "fundamentally unfair." *See League of*

22

*Women Voters of Ohio v. Brunner*, 548 F.3d 463, 475-78 (6th Cir. 2008) (holding plaintiffs stated valid substantive due process claim by alleging State chronically failed to provide "systems, procedures, and funding" to local election officials); *see also Husted*, 696 F.3d at 597 (failures to implement uniform standards violates due process if they 'result in significant disenfranchisement and vote dilution[.]'").

## B.    Plaintiffs will suffer irreparable harm absent an injunction.

The violation of a constitutional right, especially the right to vote, is irreparable. *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1340 (N.D. Ga. 2018). *No one* in this country should have to wait *hours* to vote, much less stand in line until 1 a.m., or come back repeatedly in hopes of a shorter line after a long day at work, or trade their health, their job, their schooling, to exercise this most fundamental right. A failure to fix this problem *now* cannot be undone in November. *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) ("[O]nce the election occurs, there can be no do-over and no redress.").

Absent relief, individual plaintiffs, Georgia voters, and the organizational plaintiffs will all suffer irreparable harm.[10] Ex. 30 at ¶ 9; Ex. 31 at ¶ 8; Ex. 32 at ¶ 8;

---

[10] Georgia has a history of letting deeply problematic voting rights issues fester until a federal court intervenes. *See Curling v. Kemp*, 334 F.Supp.3d 1303, 1327 (N.D. Ga. 2019 (testimony and evidence indicated that "State election officials had buried

23

Ex. 60 at ¶¶ 18-19; Ex. 63, ¶¶ 10-11; *see also Ga. Coalition for the People's Agenda v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) ("plaintiffs' organizational missions, including registration and mobilization efforts, will continue to be frustrated and organization resources will be diverted to assist" with the challenged law, as "[s]uch mobilization opportunities cannot be remedied once lost").

## C.    The balance of the equities and the public interest favor an injunction.

The balance of the equities favors the relief that Plaintiffs seek. This Court has found that "[t]he potential hardships that Georgia might experience are minor when balanced against the right to vote, a right that is essential to an effective democracy." *United States v. Georgia*, 892 F. Supp. 2d 1367, 1377 (N.D. Ga. 2012). Plaintiffs and other Georgia voters face severe burdens and potential disenfranchisement by having to wait in line for hours to vote. *See, e.g.*, Ex. 30, Ex. 31, ¶¶ 5-7, Ex. 32, ¶¶ 3-7, Exs. 67-113. Defendants will not be burdened by an injunction that requires them to do their job: implement common sense measures to ensure voters are not burdened by long lines. *See, e.g., Corby v. Scranton Housing Authority*, 2005 WL 6789319, at *4 (M.D. Pa. June 7, 2005) ("An injunction

---

their heads in the sand" about security vulnerabilities permitted by outdated voting software system, which "wound[ed] or reasonably threatened to wound the integrity of the state's election system").

24

requiring Defendants to follow [federal law] presents no additional burden upon Defendants.").

Issuing the requested injunction is also in the public interest, which "is served when constitutional rights are protected." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (citation omitted). *See also Jones v. Governor of Fla.*, 950 F.3d 795, 831 (11th Cir. 2020) ("The public, of course, has every interest in ensuring that their peers who are eligible to vote are able to do so in every election."); *Georgia Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268 (finding injunctive relief in public's interest to ensure there was "a procedure in place to allow every eligible Georgia citizen to register and vote"). A preliminary injunction would ensure Georgians are able to exercise their right to vote in the November election and reduce voters' risk of exposure to COVID-19. That risk of danger to public health is substantial, imminent, and ongoing. The public interest factor therefore strongly favors the granting of injunctive relief.

## IV.   CONCLUSION

For all of these reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction requiring Defendants to provide sufficient election resources to prevent voters from having to wait in unreasonably long lines on Election Day in accord with the optimization approach outlined in Dr. Yang's report.

LEGAL149237690.3

Dated:  September 1, 2020

Respectfully submitted,
*/s/ Adam M. Sparks*
Halsey G. Knapp, Jr.
Georgia Bar No. 425320
Joyce Gist Lewis
Georgia Bar No. 296261
Adam M. Sparks
Georgia Bar No. 341578
**KREVOLIN & HORST, LLC**
One Atlantic Center
1201 W. Peachtree Street, NW, Ste. 3250
Atlanta, GA 30309
Telephone: (404) 888-9700
Facsimile: (404) 888-9577
hknapp@khlawfirm.com
jlewis@khlawfirm.com
sparks@khlawfirm.com

Marc E. Elias*
Amanda R. Callais*
Jacki L. Anderson*
Tre Holloway*
**PERKINS COIE LLP**
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
MElias@perkinscoie.com
ACallais@perkinscoie.com
JackiAnderson@perkinscoie.com
THolloway@perkinscoie.com

Kevin J. Hamilton*
Amanda J. Beane*
Heath Hyatt*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900

26

Seattle, WA 98101-3099
Telephone: (206) 359-8000
Facsimile: (206) 359-9000
KHamilton@perkinscoie.com
ABeane@perkinscoie.com
HHyatt@perkinscoie.com

Marcus Haggard*
**PERKINS COIE LLP**
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: (303) 291-2300
Facsimile: (303) 291-2400
MHaggard@perkinscoie.com

Molly Mitchell*
**PERKINS COIE LLP**
1111 West Jefferson Street, Suite 500
Boise, ID 83702-5391
Telephone: (208) 343-3434
Facsimile: (208) 343-3232
MMitchell@perkinscoie.com

*Admitted Pro Hac Vice*

Attorneys for Plaintiffs

27

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| LUCILLE ANDERSON, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>    Defendants. | Civil Action No. 1:20-cv-03263-MLB |

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of L.R. 5.1, using font type of Times New Roman and a point size of 14.

Dated: September 1, 2020

**<u>Adam M. Sparks</u>**
*Counsel for Plaintiffs*

28

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| LUCILLE ANDERSON, *et al.*,<br><br>    Plaintiffs,<br><br>  v.<br><br>BRAD RAFFENSPERGER, *et al.*,<br><br>    Defendants. | Civil Action No. 1:20-cv-03263-MLB |

## **CERTIFICATE OF SERVICE**

I hereby certify that on August ___ 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Dated: September 1, 2020          **Adam M. Sparks**
                                 *Counsel for Plaintiffs*

29