IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LUCILLE ANDERSON, SARA ALAMI, GIANELLA CONTRERAS CHAVEZ, DSCC, and DEMOCRATIC PARTY OF GEORGIA, INC., | |
| *Plaintiffs*, | CIVIL ACTION |
| v. | FILE NO. 1:20-CV-03263-MLB |
| BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and Chair of the Georgia State Election Board, *et al.,* | |
| *Defendants*. | |

## BRIEF IN SUPPORT OF COUNTY DEFENDANTS'[1] MOTION TO DISMISS

Article III and the separation of powers forbid the Judiciary from weighing in on political debates and making policy decisions within the purview of the Legislature. But that is precisely what Plaintiffs[2] ask the

---

[1] County Defendants are the members of the Boards of Election for Chatham, Clayton, Cobb, DeKalb, Douglas, Fulton, Gwinnett, Henry, and Macon-Bibb Counties, as listed on pages 3-4 of Plaintiffs' Complaint [Doc. 1], and as further amended by the Court's Order substituting a Henry County Board of Elections and Registration Official-Capacity Defendant [Doc. 90].

[2] Plaintiffs are three individual Georgia voters ("Individual Plaintiffs") and two political organizations: the DSCC and the Democratic Party of Georgia, Inc. ("DPG") (collectively, the "Organizational Plaintiffs").

Court to do in this case. They ask the Court to "remedy" past long lines at certain polling locations by entering the political arena and adopting vague and undefined "standards" advocated by unelected, partisan academics, lobbyists, and political parties and interest groups. In doing this, however, Plaintiffs fail to allege the legal requirements of injury, traceability, or redressability. For instance, to achieve their desired results, Plaintiffs ask the Court to adopt nebulous remedies like requiring "sufficient" polling places, "clear guidance and instructions" on counting votes, and several other policy decisions. Yet the political-question doctrine precludes the Court from wading into such matters without judicially manageable standards. Thus, the Court should dismiss Plaintiffs' Complaint[3] and direct them to the Georgia Legislature and their elected representatives if they want to lobby for and make changes to Georgia's election laws.

## ARGUMENT AND CITATION OF AUTHORITY

### I.    Plaintiffs lack standing.

Article III of the Constitution limits the subject-matter jurisdiction of federal courts. U.S. CONST. art. III § 2. A party invoking federal jurisdiction bears the burden of establishing standing at the start of the lawsuit. *Lujan v.*

---

[3] Clayton Defendants assert, and hereby preserve, their defenses of insufficient service of process and lack of personal jurisdiction.

*Defenders of Wildlife*, 504 U.S. 555, 561, 570 n.5 (1992); *Johnson v. Bd. of Regents*, 263 F.3d 1234, 1267 (11th Cir. 2001).

Standing requires proof of: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, No. 19-14552, 2020 U.S. App. LEXIS 28078, at *14 (11th Cir. Sep. 3, 2020) citing *Lujan,* 504 U.S. at 560-561. And, "when plaintiffs seek prospective relief to prevent future injuries, they must prove that their threatened injuries are 'certainly impending.'" *Id.* at *15*, citing *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013).

Moreover, a complaint must be dismissed under Fed. R. Civ. P. 12(b)(1) if it has not alleged a sufficient basis for subject-matter jurisdiction. *Stalley v. Orlando Reg'l Healthcare Sys.*, 524 F.3d 1229, 1232 (11th Cir. 2008). This Court must address threshold issues of jurisdiction and standing before considering dismissal on the merits. *Georgia Shift v. Gwinnett Cty.*, No. 1:19-cv-01135-AT, 2020 U.S. Dist. LEXIS 31407, at *7 (N.D. Ga. Feb. 12, 2020). As one court has noted, in a challenge to jurisdiction in a factual 12(b)(1) motion, Plaintiffs' allegations do not enjoy the same degree of deference afforded under 12(b)(6):

> Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction -- its very power to hear the case -- there is substantial authority that **the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case**. In short, **no presumptive truthfulness attaches to plaintiff's allegations**, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, **the plaintiff will have the burden of proof that jurisdiction does in fact exist.**

*Eaton v. Dorchester Dev., Inc.*, 692 F.2d 727, 732 n.9 (11th Cir. 1982) (emphasis added).

### A.   *Plaintiffs fail to identify an injury.*

Under Article III, this Court must first determine whether Plaintiffs have adequately pleaded an injury. Neither the Organizational Plaintiffs nor the Individual Plaintiffs have met this burden.

At the pleading stage, the allegations must "contain sufficient detail for the Court to determine that plaintiffs 'have made factual averments sufficient, if true, to demonstrate injury in fact.'" *Georgia Shift*, 2020 U.S. Dist. LEXIS 31407, *8-9 quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378 (1982). In cases involving injunctive relief, "the injury-in-fact requirement insists that a plaintiff allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future." *Strickland v. Alexander,* 772 F.3d 876, 883 (11th Cir. 2014).

4

"The Supreme Court rejected a standing test that would replace the requirement of 'imminent' harm with the requirement of 'a realistic threat' that . . . the challenged activity would cause [the plaintiff] harm 'in the reasonably near future.'" *Georgia Shift*, 2020 U.S. Dist. LEXIS 31407, at *9. Further, the "complainant must allege an injury to himself that is distinct and palpable,' as distinguished from merely abstract,' and the alleged harm must be actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.,* citing *Whitmore v. Arkansas,* 495 U.S. 149, 155 (1990). The rationale behind these requirements is simple: To "ensure[] that courts do not entertain suits based on speculative or hypothetical harms." *Lujan,* 504 U.S. at 564, n.2. But that is exactly what Plaintiffs ask the Court to do.

1. **The Individual Plaintiffs have not alleged any cognizable injury.**

The three individual Plaintiffs fall into two categories. First, Plaintiffs Anderson and Contreras Chavez are (apparently) "planning" to vote in person, but are worried they will wait in long lines. [Doc. 1 at ¶¶ 12, 13]. Plaintiff Alami (evidently) "hopes" to vote absentee,[4] but because she allegedly did not receive her absentee ballot during the June Primary, "she is

---

[4] County Defendants note that the Complaint does not specify whether Plaintiff Alami hopes to vote absentee-by-mail or absentee-in-person through early voting, but based on the context of the Complaint, it appears she would hope to vote absentee-by-mail.

concerned that she will have to vote in-person and wait in a long line again to vote in November." *Id*. at ¶ 13. In sum, the Plaintiffs only generally allege past harm by long lines at some voting locations in Georgia, and then predict long lines in the November 2020 general election. And Plaintiffs cite generalized worry that COVID-19 will "exacerbate" lines at the polls.

Put simply, Plaintiffs' pleadings contain only "hypothetical," "abstract," and "conjectural" harms. When Plaintiffs filed their Complaint, they noted "Georgia is currently experiencing a surge in COVID-19 cases statewide." [Doc. 1 at ¶ 192]. But in the month since then, that surge appears to have significantly waned. *See COVID Daily Status Report*, Georgia Department of Public Health, https://dph.georgia.gov/covid-19-daily-status-report (last accessed September 7, 2020).

Neither Plaintiffs, Defendants, nor this Court can say with any degree of certainty how severe the COVID-19 pandemic will be in another two months or that its presence will increase the likelihood of an unconstitutionally burdensome long line—or that any action of Defendants will be the cause of a long line. To do so is the very definition of a future, "conjectural" harm. And "allegations of *possible* future injury are not sufficient," to establish standing. *Clapper*, 568 U.S. at 409 (emphasis added).

Plaintiffs unwittingly acknowledge their injury is speculative. They

only: (1) allege theoretical injuries stemming from past experiences on different voting machines and guesswork on how severe the pandemic may or may not be in the months to come, (2) and frame their injury in terms of their own aspirations or feelings of apprehension about particular methods of voting—none of which they are required to use. *Id.*

Plaintiffs even concede that there are multiple possible causes of past long lines and those causes do not necessarily correlate to the challenged actions. [Doc. 1 at ¶¶ 38-45]. Instead, Plaintiffs focus merely on the potential "injury" of waiting in line and throw in some "we can do better" remedies for this Court to impose. But even if the Individual Plaintiffs could articulate some non-speculative injury, they still do not allege a sufficiently *particularized* injury. They admit they are just "concerned bystanders" and cannot trace a particularized injury to themselves. *Gardner v. Mutz*, 962 F.3d 1329, 1342 (11th Cir. 2020). Because the Individual Plaintiffs have not adequately alleged any injury-in-fact, their claims should be dismissed.

2. **The Organizational Plaintiffs fail to identify how they will divert resources on account of the County Defendants' conduct.**

The DSCC and DPG are political organizations and claim organizational standing to sue. "An organization may demonstrate a concrete, imminent injury either through a 'diversion-of-resources' theory or through

an 'associational-standing' theory." *Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1336 (N.D. Ga. 2018) citing *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341–42 (11th Cir. 2014). "[A]n organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Crittenden*, 347 F. Supp. 3d at 1336 citing *Arcia*, 772 F.3d at 1341. Plaintiffs cannot get away with merely reciting resource "diversion" as a legal conclusion. *Jacobson*, 2020 U.S. App. LEXIS 28078, at *27. Instead, they must allege *facts* identifying where the diversion occurred.

Rather than meeting this burden, the Organizational Plaintiffs only allege they will keep pursuing their respective general missions. [Doc. 1 ¶¶ at 15–16]. The DSCC notes its "mission is to elect candidates of the Democratic Party to the U.S. Senate, including in Georgia." [Doc. 1 at ¶ 15]. The DSCC alleges that long lines "discourage voters from voting . . ." *Id.* They claim they "*will have to* divert funds and resources for voter turnout efforts in Georgia at the expense of its other activities, like polling . . ." *Id.* Yet they make no allegations about where those financial resources are diverted from, except to vaguely suggest they go to voter turnout efforts. But voter turnout aligns exactly with the DSCC's mission, which they admit is to elect Democrats by

8

"turn[ing] out its core constituencies and supporters to vote…" *Id.* And polling is part and parcel its "voter turnout efforts."

DPG fairs no better. DPG characterizes its mission as "elect[ing] Democratic candidates in Georgia," and they accomplish this by "turn[ing] out its core constituencies and supporters to vote…" [Doc. 1 at ¶ 16]. As with the DSCC, Plaintiffs claim the potential long lines will cause DPG to need to "divert resources to provide support for voters to help them avoid disenfranchisement…" *Id.* Again, however, supporting voters they believe are likely to vote for Democrats *is* the mission of DPG, and they cannot claim a diversion of resources where they are merely carrying out this mission.

To sufficiently divert resources for standing purposes, an organizational plaintiff must allege a "concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – [that] constitutes far more than simply a setback to the organization's abstract social interests." *Havens Realty Corp.,* 455 U.S. at 379. If a complaint contains only "generic and abstract" allegations of injury, the complaint must be dismissed for lack of standing. *In re Equifax, Inc.*, 371 F. Supp. 3d 1150, 1165-1166 (N.D. Ga. 2019).

Plaintiffs make only conclusory and abstract allegations about resource diversion *from* one aspect of fulfilling their organizational purpose *to* another.

9

But this does not constitute a concrete and demonstrable injury under Article III. By vaguely asserting the specter of long lines will cause the DSCC to "increase their efforts" in Georgia "at the expense of its other activities . . . in other states holding elections for the U.S. Senate," *see, e.g.*, [Doc. 1 at ¶ 15][5], Plaintiffs claim the exact injury *Jacobson* found insufficient. 2020 U.S. App. LEXIS 28078, at *28-29. Further, the DSCC's suggestion that it would redirect support from Georgia back to other states is not plausible because Plaintiffs admit that two Georgia U.S. Senate seats are contested in the upcoming election. [Doc. 1 at ¶ 15]. Regardless of the outcome of this case, it is hard to imagine that DSCC will reduce support in Georgia. Unless the DSCC changes its mission, it will continue to make every effort to win Georgia elections – no matter the length of voting lines. This is especially true since these very same Organizational Plaintiffs have, in another case in this District, characterized Georgia's Senate seats as "political 'toss ups,'" *SPS v. Raffensperger*, Case No. 1:19-cv-04960-AT, First Amended Complaint, Doc. 17 at ¶ 37 and that they expect that Democrats will "gain more [seats] in the State House in 2020." *Id*. at ¶ 38.

As the Seventh Circuit recently explained, organizations cannot support a claim of standing "based solely on the baseline work they are

---

[5] Plaintiff DPG does not make this claim, as it operates only in Georgia.

already doing. They cannot convert ordinary program costs into an injury in fact. The question is what additional or new burdens are created by the law [or practice] the organization is challenging. It must show that the disruption is real and its response is warranted." *Common Cause Ind. v. Lawson*, 937 F.3d 944, 955 (7th Cir. 2019) (internal quotations and citations omitted). Organizations must show that the challenged law's effect "goes far beyond 'business as usual'" through "concrete evidence showing that [the law] is already disrupting their operations and . . . will likely require them to significantly change or expand their activities." *Id.*

Unlike Plaintiffs, political organizations that have successfully demonstrated standing under a diversion-of-resources theory have done so by providing courts with specific examples as to how they have had to change their operations to address a challenged law. *See, e.g. Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009); *Florida State Conference of N.A.A.C.P. v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341-42 (11th Cir. 2014). In contrast, courts regularly dismiss cases when organizations fail to identify some meaningful *change* from their usual operations required by the challenged law. *See Fair Elections Ohio v. Husted*, 770 F.3d 456, 459-460 (6th Cir. 2014) (organization's election volunteers were already being trained

about voting procedures); *Ind. Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 816-17 (S.D. Ind. 2006) (plaintiffs "vaguely assert[ed]" that they would "divert unspecified resources to various outreach efforts"); *see also Gardner*, 962 F.3d at 1341 (generalized interest in preserving history not sufficiently concrete).

The Organizational Plaintiffs allege no activities they plan to change and allege no disruption to their operations. Rather, they merely allege that they will be fulfilling their organizational purposes and perceive the possibility of long lines and the potential for improper practices at individual voting locations as "simply a setback to [their] abstract social interests" of winning elections and turning out the vote. *See Havens Realty Corp.,* 455 U.S. at 379. Their Complaint does not set forth a legally cognizable basis for standing and, as such, their claims should be dismissed.

Thus, the entire diversion of resources presented by Organizational Plaintiffs in their Complaint is the cost of pursuing this lawsuit, which is not sufficient for Article III standing. *Fla. State Conf. of the NAACP v. Browning*, 522 F.3d 1153, 1166 (11th Cir. 2008); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015).

Finally, if DPG claims associational standing on behalf of its Georgia members, that argument fails for the same reasons that the Individual

Plaintiffs cannot establish standing. The same attenuated fears are not an injury for purposes of Article III. *Clapper,* 568 U.S. at 409. No Plaintiff here alleges an actual injury for standing purposes and this case should be dismissed on that basis alone.

**B.    *Neither the Organizational Plaintiffs nor the Individual Plaintiffs have adequately alleged redressability because they have not sued all 159 counties.***

**1.    Plaintiffs have not joined all Georgia counties.**

As the Eleventh Circuit recently explained, "it must be the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly." *Lewis v. Governor of Ala.,* 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (internal quotations omitted).

The Georgia Election Code imposes statutory responsibilities on Georgia counties. *See, e.g.*, O.C.G.A. §§ 21-2-260 et seq. (as to setup of precincts and polling places); 21-2-263 (requiring reduction of precinct size when voters wait in line more than one hour after closing of polls). But Plaintiffs only name members of nine county boards of election along with the Secretary of State and members of the State Election Board, even though

both the DPG and DSCC purport to work throughout Georgia.[6] [Doc. 1 at ¶¶ 15–16] (noting the DSCC's interest in the *statewide* U.S. Senate elections, and DPG's interest "on behalf of its voter members" located through the state of Georgia). Thus, even if Plaintiffs obtain all the relief they seek, this Court's order cannot enjoin "absent nonparties." *Jacobson*, 2020 U.S. App. LEXIS 28078, at *40. Because the Organizational Plaintiffs here seek targeted relief from cherry-picked parties while leaving out other counties in the state, they fail to establish redressability for its claimed "injuries" from alleged diversions of resources will cease. [Doc. 33 at ¶¶ 17-19].

Plaintiffs' failure to sue the parties that can redress the alleged harm could also lead to "arbitrary and disparate treatment to voters in its different counties," *Bush v. Gore*, 531 U.S. 98, 107, 121 S. Ct. 525, 531 (2000), with nine counties bound by an order from this Court and the remaining 150 counties following existing law.[7] *See also Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1381 (S.D. Fla. 2004) (error not to join other county election officials).

---

[6] While Georgia law designates the Secretary as the "chief election officer of the state," it does not follow that every alleged injury or request for relief in the election context is therefore traceable to the Secretary. *See Jacobson*, 2020 U.S. App. LEXIS 28078, at *36; *Lewis*, 944 F.3d at 1300.

[7] While the Eleventh Circuit issued a decision pre-dating *Jacobson*, *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011), it only decided that case under a proper-party analysis and did not consider standing, making it a "drive-by jurisdictional ruling" that has no precedential effect. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91, 118 S. Ct. 1003, 1011 (1998).

In other words, granting Plaintiffs the relief they seek would lead to different rules for elections in different parts of the state, based solely on Plaintiffs' choice over which counties to sue in this particular case. Thus, Plaintiffs undermine their own claims of imminent "injury," "redress," or "equal protection" by leaving out the other counties which would prolong any uniform implementation or enforcement of any order issued by this Court.

Some district courts have succumbed to the temptation to correct the deficient pleadings of plaintiffs that fail to join all necessary parties, but the Eleventh Circuit's decision in *Jacobson* establishes that this Court should refrain from doing the same. A declaratory judgment or injunction against the eight County Defendants here cannot apply to counties "who are not parties to this action." *Jacobson,* 2020 U.S. App. LEXIS 28078, at *39. And even if this Court tried to apply its ruling to counties not now before it, the 150 non-party counties are not "obliged . . . in any binding sense . . . to honor an incidental legal determination [this] suit produce[s]." *Lewis*, 944 F.3d at 1301 (internal quotation marks omitted). The separation of powers and the inherent, limited authority under Article III prevent the judiciary from binding non-parties to its orders and cherry-picking certain counties is inherently a political decision.

"Redressability requires that the court be able to afford relief *through the exercise of its power,* not through the persuasive or even awe-inspiring effect of the opinion *explaining* the exercise of its power." *Id*. at 1305, quoting *Franklin v. Mass.,* 505 U.S. 788, 825 (Scalia, J. concurring in part and concurring in the judgment). "Any persuasive effect a judicial order might have upon the [non-party counties] . . . cannot suffice to establish redressability." *Jacobson*, 2020 U.S. App. LEXIS 28078, at *40. Moreover, "[i]f a plaintiff sues the wrong defendant, an order enjoining the correct official who has not been joined as a defendant cannot suddenly make the plaintiff's injury redressable." *Id.* at *43.

The "failure to join the [county officials] is an independent reason that [plaintiffs] lack standing," *id*. at *35, and accordingly, this Court should dismiss Plaintiffs' Complaint because they have not adequately alleged facts sufficient to support standing.

### 2.   Plaintiffs' putative injuries are not redressable because they seek an "obey the law" injunction.

Plaintiffs also lack standing because their requested relief amounts to an ambiguous "obey the law" injunction. Plaintiffs' request for relief asks the Court to take vague actions such as requiring Plaintiffs to provide a "sufficient number" and "equitable distribution" of polling places and

resources "to prevent voters from having to wait in unreasonably long lines on Election Day," including providing "sufficient" poll workers, technicians, time for setting up locations, backup paper pollbooks, and emergency paper ballots. [Doc. 1, p. 79]. "It is well-established in this circuit that an injunction demanding that a party do nothing more specific than 'obey the law' is impermissible" and violates the specificity requirements of Federal Rule of Civil Procedure 65. *Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006); Fed. R. Civ. P. 65(d) (requiring every order granting an injunction to specifically state its terms and the acts restrained or required). Further, this Court "cannot guarantee that voters will not have to stand in line." *Georgia Shift*, 2020 U.S. Dist. LEXIS 31407, *14. And "any injunction that would pretend otherwise and purport to impose obligations on Defendants to take all necessary action to ensure against such circumstances would be too amorphous to be capable of enforcement." *Id.* (internal quotation marks omitted). As a result, Plaintiffs' Complaint must be dismissed for lack of standing.

## II. Plaintiffs fail to state a claim for relief because long lines are not a practice of voting.

The sole basis for Plaintiffs' Complaint against County Defendants is "long lines," which Plaintiffs claim is caused by any number of possible

practices. [Doc. 1 at ¶¶ 200, 206-207]. Plaintiffs apparently do not challenge any underlying practices, but believe that long lines alone can support a federal lawsuit that seeks to impose a variety of possible reliefs. [Doc. 1, pp. 79-80]. Plaintiffs rely on an unsupported statement in a single district-court decision for the concept that long lines alone may promote a cause of action. In other contexts, courts have determined that long lines, standing alone, are not a practice or procedure of voting for purposes of Section 2 of the Voting Rights Act. *Lee v. Va. State Bd. of Elections*, 155 F. Supp. 3d 572, 583 (E.D. Va. 2015) *partially modified after reconsideration on other grounds by Lee v. Va. State Bd. of Elections*, Civil Action No. 3:15CV357-HEH, 2016 U.S. Dist. LEXIS 185846, at *5 (E.D. Va. Feb. 2, 2016).

Plaintiffs have failed to state a claim because they rely on long lines and do not challenge the practices they say lead to long lines. By attacking a symptom instead of what they believe is the cause, Plaintiffs have not properly invoked the limited jurisdiction of this Court.

## III. Plaintiffs' Complaint raises a solely nonjusticiable political question beyond the jurisdiction of this Court.

### A. *Political questions fall outside Article III jurisdiction.*

"[F]ederal courts will not intervene to . . . supervise the administrative details of a local election." *Curry v. Baker*, 802 F.2d 1302, 1314 (11th Cir.

1986). The judicial system is not a conduit for a particular group to force election officials to adopt its preferred method of administering elections. *GALEO v. Gwinnett Cty. Bd. of Registrations & Elections*, No. 1:20-cv-1587-WMR, 2020 U.S. Dist. LEXIS 86998, at *3 (N.D. Ga. May 8, 2020).

While courts can "say what the law is," there are some questions that are "in their nature[,] political" and beyond the scope of Article III. *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 170, 177 (1803). "A federal court has no authority to review a political question." *McMahon v. Presidential Airways, Inc.*, 502 F.3d 1331, 1357 (11th Cir. 2007). The political-question doctrine "protects the separation of powers and prevents federal courts from overstepping their constitutionally defined role." *Id.*, *citing Baker v. Carr,* 369 U.S. 186, 210 (1962). If a case requires the court to decide a political question, it must be dismissed for lack of jurisdiction. *Made in the USA Found. v. U.S.*, 242 F.3d 1300, 1319 (11th Cir. 2001).

The Supreme Court identified six elements likely to be "prominent on the surface of any case held to involve a political question":

[1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for

unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. 186, 216 (1962). "Significantly, any one of the above-listed characteristics may be sufficient to preclude judicial review." *Made in the USA Found.*, 242 F.3d at 1312.[8] At least two of those indicia are present in this case.

### B. The Constitution requires most decisions about elections to be made by States.

As for the first *Baker* factor—a "textually demonstrable constitutional commitment of the issue to a coordinate political department"—the Elections Clause of the United States Constitution (Art. I, §4, cl. 1) commits the "Times, Places and Manner of holding Elections" to state legislatures, while giving Congress the power to "make or alter" any such regulations. The Elections Clause's delegation of power to state legislatures and Congress is expansive:

It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and

---

[8] While the existence of any one of the *Baker* factors suggests a case presents a nonjusticiable political question, courts have generally held that the first two *Baker* factors are generally the most important. *See Alperin v. Vatican Bank*, 410 F.3d 532, 545 (9th Cir. 2005) (collecting cases).

canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

*Smiley v. Holm,* 285 U.S. 355, 366 (1932).

The Constitution specifically reserves authority on the integrity and efficiency of elections to the states. *Storer v. Brown*, 415 U.S. 724, 730 (1974); *see also Wexler v. Anderson*, 452 F.3d 1226, 1232 (11th Cir. 2006). "[T]he framers of the Constitution intended the States to keep for themselves, as provided by the Tenth Amendment, the power to regulate elections." *Gregory v. Ashcroft*, 501 U.S. 452, 461–62 (1991) (quoting *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973)); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (voters do not have an absolute right to vote in any way they choose).

Here, "Plaintiffs ask this Court to assume the roles of state and federal legislatures, urging us to exercise the *discretion* that has been explicitly reserved to those political bodies." *Agre v. Wolf*, 284 F. Supp. 3d 591, 596 (E.D. Pa. 2018) (emphasis in original). Plaintiffs' claims present nonjusticiable political questions because they require this Court to replace Georgia's Election Code with this Court's judgment about the administration of elections, despite the "textually demonstrable constitutional commitment

21

of the issue" to state legislatures and to Congress. *Baker*, 369 U.S. at 217; *Agre*, 284 F. Supp. 3d at 620.

### C. Plaintiffs ask this Court to involve itself in the minutiae of elections—a task for which there are no judicially manageable standards.

Much like cases alleging partisan gerrymandering, where courts were improperly called on to decide the definition of "fairness" and then "[h]ow much is too much," *Rucho v. Common Cause*, 139 S. Ct. 2484, 2500-01 (2019), Plaintiffs ask this Court to take on the task of election administration by requiring "equitable distribution," "sufficient" resources, and "clear guidance and instructions." [Doc. 1, p. 79]. But there "are no discernable and manageable standards 'to answer the determinative question'" in this case. *Jacobson*, 2020 U.S. App. LEXIS 28078, at *63. The judiciary is ill-equipped to handle these questions that involve the "complex, subtle, and professional decisions" required to conduct elections. *Gilligan v. Morgan*, 413 U.S. 1, 10, 93 S. Ct. 2440, 2446 (1973) (applied to military training). Ultimately, Plaintiffs' Complaint "poses basic questions that are political, not legal." *Rucho*, 139 S. Ct. at 2489; *Jacobson*, 2020 U.S. App. LEXIS 28078, at *56. There are simply no "satisfactory criteria for a judicial determination." *Wymbs v. Republican State Exec. Comm.*, 719 F.2d 1072, 1076 (11th Cir. 1983) *quoting Baker*, 369 U.S. at 283.

As another case in this Court recently held, "[i]t is especially important during crises such as the present one involving a medical pandemic that the Court hew closely to the Constitution's original imperatives." *Coal. for Good Governance v. Raffensperger,* No. 1:20-cv-1677-TCB, 2020 U.S. Dist. LEXIS 86996, at *7 - 8 (N.D. Ga. May 14, 2020). The court found that:

> This starts with the Elections Clause, which commits the administration of elections to Congress and state legislatures— not courts. The Framers of the Constitution did not envision a primary role for the courts in managing elections, but instead reserved election management to the legislatures. Absent pellucid proof provided by plaintiffs that a political question is not at issue, courts should not substitute their own judgments for state election codes.

*Id*. at *8.

Like Plaintiffs here, the *Coalition* plaintiffs asked the court to enforce a laundry list of new voting practices and procedures that the plaintiffs felt would make voting safer and more accurate in the approaching election. But the court declined the invitation to overstep its constitutional bounds because "there are no judicially discoverable and manageable standards for resolving," which of the plaintiffs' requested practices were within the court's power to impose, and which were not. *Id.*

Similarly, Plaintiffs ask the Court to invade the province of a coordinate branch of government, based on the hypothetical problems of a

future election, using new election equipment, under the cloud of a possibly severe pandemic. Plaintiffs ask the Court to force state election officials and some, but not nearly all, county election officials to acquiesce to demands the Plaintiffs believe will help alleviate possible long lines at the polls. Paragraph 98 of the Complaint (with some light commentary) provides a good example of the policy proposals masquerading as relief requested by Plaintiffs.

> The State Defendants (as well as the Fulton County Defendants) could easily remedy [in Plaintiffs' opinion] the chronically long lines that Fulton County has witnessed in election after election, including by providing [what Plaintiffs deem is] clear guidance on the number of polling locations [Plaintiffs feel are] needed, as well as the [as yet undetermined] number of voters who should be allocated to each location to minimize congestion and lines, [abstractly] assisting in the recruiting and staffing of poll workers, providing [an unquantified amount of] sufficient voting equipment, requiring backup paper pollbooks and [unquantified but] adequate numbers of emergency paper ballots for use when problems do arise, as well as [what Plaintiffs deem is] clear guidance and training on when to use those ballots, and ensuring [what Plaintiffs feel is] adequate poll worker training and technical support."

[Doc. 1 at ¶ 98]. These requests by Plaintiffs are *precisely* the determinations committed to the discretion and experience of state and local governments running elections. Not only is it beyond this Court's constitutional authority to navigate the minutiae of elections in the manner Plaintiffs request, but the Court simply cannot create or use any judicially manageable standards in trying to do so.

"[N]o justiciable 'controversy' exists when parties seek adjudication of a political question . . . ." *Mass. v. EPA*, 549 U.S. 497, 516, 127 S. Ct. 1438, 1452 (2007). As the court in *Coalition* concluded, it would have to "micromanage the State's election process" to grant relief. *Coalition for Good Governance*, 2020 U.S. Dist. LEXIS 86996, at *9. So it was there, and so it is here. Courts should not assume the "'discretionary power over elections'" that the Constitution assigns to the state and federal legislatures." Jacobson, 2020 U.S. App. LEXIS 28078, at *80 quoting *The Federalist No. 59*, at 306 (Alexander Hamilton) (George W. Carey & James McClellan eds., 2001).

Given the foregoing, this Court should dismiss Plaintiffs' claims because they are nonjusticiable political questions.

## **CONCLUSION**

Plaintiffs' Complaint fails at the first hurdle it must pass—this Court's limited jurisdiction. This Court should dismiss Plaintiffs' Complaint and end this attempt to engage the Court in a policy exercise.

Respectfully submitted this 8th day of September, 2020.

| | |
|---|---|
| */s/ Bryan P. Tyson*<br>Bryan P. Tyson<br>Georgia Bar No. 515411<br>btyson@taylorenglish.com<br>Diane Festin LaRoss<br>Georgia Bar No. 430830<br>dlaross@taylorenglish.com<br>Bryan F. Jacoutot<br>Georgia Bar No. 668272<br>bjacoutot@taylorenglish.com<br>Loree Anne Paradise<br>Georgia Bar No. 382202<br>lparadise@taylorenglish.com<br>**TAYLOR ENGLISH DUMA LLP**<br>1600 Parkwood Circle, Suite 200<br>Atlanta, GA 30339<br>770.434.6868 (telephone)<br><br>*Counsel for the Gwinnett County Defendants* | */s/ Jack R. Hancock*<br>Jack R. Hancock<br>Georgia Bar No. 322450<br>jhancock@fmglaw.com<br>A. Ali Sabzevari<br>Georgia Bar No. 941527<br>asabzevari@fmglaw.com<br>**Freeman Mathis & Gary, LLP**<br>661 Forest Parkway, Suite E<br>Forest Park, Georgia 30297<br>(404) 366-1000 (telephone)<br>(404) 361-3223 (facsimile)<br><br>*Counsel for the Clayton County Defendants* |
| */s/ Daniel W. White*<br>Daniel W. White<br>Georgia Bar No. 153033<br>dwhite@hlw-law.com<br>**HAYNIE, LITCHFIELD &  WHITE, PC**<br>222 Washington St.<br>Marietta, Georgia 30064<br>770-422-8900 (telephone)<br>770-424-8900 (facsimile)<br><br>*Attorney for Cobb County Defendants* | */s/ Shelley D. Momo*<br>Shelley D. Momo<br>Assistant County Attorney<br>Georgia Bar No. 239608<br>Irene B. Vander Els<br>Assistant County Attorney<br>Georgia Bar No. 033663<br>**DEKALB COUNTY LAW DEPARTMENT**<br>1300 Commerce Drive, 5th Floor<br>Decatur, Georgia 30030<br>Telephone:  (404) 371-3011<br>Facsimile:  (404) 371-3024<br>sdmomo@dekalbcountyga.gov<br>ivanderels@dekalbcountyga.gov<br><br>*Attorneys for the DeKalb County Defendants* |

| | |
|---|---|
| */s/ R. Jonathan Hart*<br>R. JONATHAN HART<br>State Bar No. 333692<br>/s/ Jennifer R. Davenport<br>JENNIFER R. DAVENPORT<br>State Bar No. 330328<br>**Chatham County Attorney's Office**<br>P. O. Box 8161<br>Savannah, GA  31412<br>T: (912) 652 7881<br>F: (912) 652 7887<br>Email: rjhart@chathamcounty.org<br>jdavenport@chathamcounty.org<br><br>*Attorneys for the Chatham County*<br>*Defendants* | */s/ David A. Cole*<br>David A. Cole<br>Georgia Bar No. 142383<br>Timothy M. Boughey<br>Georgia Bar No. 832112<br>**FREEMAN MATHIS & GARY,**<br>**LLP**<br>100 Galleria Parkway<br>Suite 1600<br>Atlanta, Georgia 30339<br>(T) 770.818.0000<br>(F) 770.937.9960<br>(E) dcole@fmglaw.com<br>tboughey@fmglaw.com<br><br>*Counsel for the Douglas County*<br>*Defendants* |
| */s/ William H. Noland*<br>WILLIAM H. NOLAND<br>Georgia Bar No. 545605<br>william@nolandlawfirmllc.com<br>**Noland Law Firm, LLC**<br>5400 Riverside Drive, Suite 205<br>Macon, Georgia 31210<br>(478)621-4980 telephone<br>(478)621-4282 facsimile<br><br>*Counsel for Macon-Bibb County*<br>*Defendants* | */s/ Kenneth P. Robin*<br>Kenneth P. Robin<br>Georgia Bar No. 609798<br>krobin@jarrard-davis.com<br>Patrick D. Jaugstetter<br>Georgia Bar No. 389680<br>patrickj@jarrard-davis.com<br>**JARRARD & DAVIS, LLP**<br>222 Webb Street<br>Cumming, Georgia 30040<br>678-455-7150 (telephone)<br>678-455-7149 (facsimile)<br><br>*Attorneys for the Henry County*<br>*Defendants* |

| | |
|---|---|
| *s/Kaye Woodard Burwell*<br>Georgia Bar Number:   775060<br>kaye.burwell@fultoncountyga.gov<br>*s/Cheryl Ringer*<br>Georgia Bar Number: 557420<br>cheryl.ringer@fultoncountyga.gov<br>*s/David R. Lowman*<br>Georgia Bar Number: 460298<br>david.lowman@fultoncountyga.gov<br><br>**OFFICE OF THE FULTON COUNTY ATTORNEY**<br>Office of the County Attorney<br>141 Pryor Street, S.W.<br>Suite 4038<br>Atlanta, Georgia 30303<br>Telephone: (404) 612-0246<br><br>*Attorneys for the Fulton County Defendants* | |

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing BRIEF IN SUPPORT OF COUNTY DEFENDANTS' MOTION TO DISMISS has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

<div align="center" style="text-align:right">

*/s/ Bryan P. Tyson*
Bryan P. Tyson

</div>