IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| LUCILLE ANDERSON, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRAD RAFFENSPERGER, in his official capacity as the Georgia Secretary of State and Chair of the Georgia State Election Board, *et al.*, <br><br> *Defendants*. | CIVIL ACTION <br><br> FILE NO. 1:20-CV-03263-MLB |

## GWINNETT DEFENDANTS'[1] RESPONSE[2] TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

### INTRODUCTION

Now that they have crunched the numbers provided by County Defendants, Plaintiffs still cannot demonstrate they have an injury that is traceable to or redressable by Gwinnett Defendants. In fact, Plaintiffs largely

---

[1] Gwinnett Defendants are Stephen Day, John Mangano, Alice O'Lenick, Ben Satterfield, and Wandy Taylor in their official capacities as members of the Gwinnett County Board of Registrations and Elections.

[2] Following Plaintiffs' filing of their Supplemental Memorandum [Doc. 148], this Court authorized by email a further response from Defendants [Order, 10/6/2020 Docket Entry].

agree that Gwinnett Defendants have properly allocated equipment to the various precincts in the county and only expect waits 60 seconds longer than their proposed threshold at two out of the 156 precincts in the county. There is no basis for this Court to order any relief as to Gwinnett Defendants.

**ARGUMENT AND CITATION OF AUTHORITY**

**I.     Plaintiffs still cannot demonstrate standing.**

*A.     Plaintiffs still cannot show any injury.*

In an attempt to show an injury, Plaintiffs largely restate their prior arguments about wait times and continue to assume that a 31-minute wait is unconstitutional while a 29-minute wait is constitutional. [Doc. 148, pp. 3-6[3]]. Despite abandoning their attempt to gain relief on the number of polling locations, Plaintiffs still argue that the lack of new polling places has contributed to lines. *Id.* at 5. In so doing, Plaintiffs ignore the ongoing growth in early voting in Georgia elections and the corresponding reduction in Election-Day voting[4]—a point that is especially relevant for Gwinnett

---

[3] All pinpoint citations to pleadings are to the blue ECF page numbers at the top of each page.

[4] The Election Administration and Voting Survey Comprehensive Report, published after each election by the U.S. Election Assistance Commission demonstrates this trend in Georgia. In 2014, 32.7% of Georgia voters voted early and 62.9% voted on Election Day. 2014 *EAVS Report*, https://www.eac.gov/sites/default/files/eac_assets/1/1/2014_EAC_EAVS_Comprehensive_Report_508_Compliant.pdf at p. 201 (Table 28). By the 2018

Defendants, who are providing more early-voting opportunities for the November election than in any prior election. [Doc. 142-1, ¶ 11].

Plaintiffs now agree that Fulton and Cobb counties are properly allocating machines to avoid wait times. [Doc. 148, pp. 19-20]. As a result, the individual Plaintiffs, Ms. Anderson, Ms. Alami, and Ms. Chavez cannot have an injury because they are residents of those counties. [Doc. 1, ¶¶ 12-14].

That leaves only the DSCC and Democratic Party of Georgia as plaintiffs with potential injuries. But these Organizational Plaintiffs do not have standing because Plaintiffs have not alleged that County Defendants have violated any statute or were under any duty to mitigate wait times. *GALEO v. Gwinnett Cty. Bd. of Registrations and Elections*, Case No. 1:20-cv-01587-WMR Doc. 58, slip op. at 14-15 (October 5, 2020). Further, the Organizational Plaintiffs have not alleged that they will be diverting resources away from their "core activities"—instead, they will be carrying out activities that "are precisely of the same nature" as those in which they would engage if lines were not an issue—electing Democrats, which cannot be an injury. *Id.* at 15-16; *see also Jacobson v. Fla. Sec'y of State*, 2020 U.S. App.

---

election, 47.91% of Georgia voters voted early instead of on Election Day. 2018 EAVS Report, https://www.eac.gov/sites/default/files/eac_assets/1/6/2018_EAVS_Report.pdf at p. 38 (Overview Table 2).

LEXIS 28078, at *28 (11th Cir. September 3, 2020) ("An organization's general interest in its preferred candidates winning as many elections as possible is still a 'generalized partisan preference[]' that federal courts are 'not responsible for vindicating'").

    B.    *Any alleged injury is based entirely on speculation.*

Plaintiffs now agree that Gwinnett Defendants "made significant changes to their voting machine allocation" and, as a result, are now "at a lower risk for voting lines of over 30 minutes long. . . ." [Doc. 148, p. 19]. As this Court covered at length at the hearing, the fact that Gwinnett and other County Defendants responded to the lessons of the June 9 primary by making significant changes demonstrates that any injury to Plaintiffs is purely speculative and is ultimately only a hypothetical future injury, not an injury that is actual or imminent. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). This speculation is not sufficient to establish Article III standing.

Despite their best efforts, Plaintiffs' Complaint was already bogged down by the unique circumstances surrounding the June 9 primary and the upcoming general election, which County Defendants previously articulated in their Consolidated Motion to Dismiss [Doc. 105-1]. In light of the new evidence provided by County Defendants, and particularly Gwinnett County, Plaintiffs' Complaint is only further mired in speculation. The harm alleged

by Plaintiffs is simply not sufficiently imminent to establish standing. "Although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is *certainly* impending*.*" *Clapper v. Amnesty Int'l USA,* 568 U.S. 398, 409 (2013) (emphasis original). But there is nothing *certain* about Plaintiffs' alleged injuries, which Plaintiffs freely acknowledge are based almost entirely on past harms. And whether they realize it or not, Plaintiffs concede as much in their Supplemental Memorandum. [Doc. 148].

Based on their own proffered expert's analysis, Plaintiffs open their Supplemental Memorandum with a claim that "crowded polling places and long lines are *likely* to reoccur." [Doc. 148, p. 3]. But the evidence and argument they offer in support does not support this initial confidence. Plaintiffs properly point out that "[p]ast wrongs do constitute evidence bearing on whether there is a real or immediate threat of repeated injury which could be averted by the insuring of an injunction." [Doc. 148, p. 3] (quoting *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984). But even with the information this Court required County Defendants to provide to Plaintiffs, nothing Plaintiffs present to this Court indicates that any injury in the upcoming general election is "certainly impending."

As was covered at the hearing, Plaintiffs base their initial Complaint almost entirely on elections carried out under a different election system. The only possible statewide election Plaintiffs can point to in order to demonstrate "past wrongs" under similar circumstances is the June primary. Given the state of the global COVID-19 pandemic at that time, the June primary can at best be considered an outlier—a "once in a lifetime" election. [Docs. 108-1, ¶ 4; 108-2, ¶ 3]. Moreover, that evidence clearly shows the Gwinnett Defendants are embarking on an entirely different path than the one they undertook for the June 9 primary. *See generally* [Docs. 108-1, 142-1]. Plaintiffs' proffered expert can speculate and theorize based on the evidence as to the ultimate outcome of Gwinnett Defendants' changes, but it will still be nothing more than speculation and not nearly imminent enough to invoke this Court's limited jurisdiction.

C. *Plaintiffs cannot establish causation for purposes of standing.*

Finally, given Plaintiffs' new perspective on Gwinnett's equipment allocation, Plaintiffs have not alleged an injury that is traceable to or redressable by Gwinnett Defendants. *Jacobson*, 2020 U.S. App. LEXIS 28078 at *35. Plaintiffs' entire allegation against Gwinnett is now that two precincts may have wait times 60 seconds beyond what they consider constitutionally appropriate. [Doc. 148, pp. 19-20]. To the extent waiting in

line an additional 60 seconds is even an injury, the entirety of Plaintiffs' suggestions for Gwinnett Defendants is to add, not additional BMDs, but rather one Poll Pad to each precinct. [Doc. 148, p. 20].

## II. Plaintiffs have shown no reason for this Court to intervene while elections are underway.

Beyond their failure to establish standing under *Clapper,* Plaintiffs face more fundamental jurisdictional hurdles regarding the proper role of the federal courts under the current circumstances. Indeed, for this Court to intervene now into an area so clearly committed to the judgment of the elected branches was covered as part of the political question doctrine, [Doc. 105-1, pp. 18-25], and would run afoul of Justice Kavanaugh's recent concurrence calling for the federal judiciary to avoid the sometimes-tempting impulse to expand its own authority under the Constitution.

Last night in *Andino v. Middleton,* 592 U.S. __ (2020), the Supreme Court stayed an injunction barring the requirement in South Carolina for a witness' signature to accompany absentee ballots. Justice Kavanaugh wrote separately, concurring in the judgment for "two alternative and independent reasons…" *Id.* (Kavanaugh, J., concurring) (slip op., at 1). First, he noted, "the Constitution 'principally entrusts the safety and the health of the people to the politically accountable officials of the States.'" *Id.* at 1–2 citing *South*

*Bay United Pentecostal Church v. Newsom,* 590 U.S. __, __ (2020) (Roberts, C.J., concurring in denial of application for injunctive relief (slip op., at 2). "When those officials undertake to act in areas fraught with medical and scientific uncertainties, their latitude must be especially broad." *Id.* at 2 (internal quotations and citations omitted)(internal alterations omitted).

Under this standard and the present circumstances, the changes made and presented to this Court by County Defendants, utilizing their knowledge and experience that flowed from the unique circumstances of the June 9 primary, are *definitively* and properly committed to the State and County Defendants. Regardless of how one feels about the Plaintiffs' proposed changes, the obligation of administering elections, particularly where the health and safety of the citizens are concerned, lies within the discretion of County Defendants. And the federal judiciary "lacks the background, competence, and expertise to assess public health and is not accountable to the people." *Id.* at 2 citing *South Bay,* 590 U.S. at __ (slip op., at 2).

Also important in Justice Kavanaugh's brief concurring opinion was the principle that, "for many years, this Court has repeatedly emphasized that federal courts ordinarily should not alter state election rules in the period close to an election." *Id.* at 2. If this Court were to act now on Plaintiffs'

requests, it would defy that principle in precisely the manner the Supreme Court has repeatedly cautioned against.

### III. Plaintiffs still do not challenge the statutory allocation.

While Plaintiffs mention the 1/250 ratio contained in O.C.G.A. § 21-2-367(b), they apparently are not challenging its constitutionality. [Doc. 148, p. 9]. Indeed, Plaintiffs now appear to agree with the policy rationale, and now only allege that "most counties" are not providing one ballot-marking device (BMD) for every 250 voters. [Doc. 148 pp. 9-10]. But to reach this issue, the Court would have to determine that county officials are violating a state law—a determination barred by the Eleventh Amendment, as County Defendants previously explained. [Doc. 108, pp. 12-14].

Plaintiffs now also acknowledge that the number of BMDs alone is not determinative, recognizing that the number of "poll books and scanners matters, too." [Doc. 148, p. 10]. For example, Dr. Muer Yang's problem with the two Gwinnett precincts has nothing to do with the allocation of BMDs and only relates to Poll Pads. [Doc. 149-1, pp. 25-26]. He explains that the only solution for his proposed issues with the two Gwinnett precincts that may have 31-minute wait times is to purchase more equipment—but purchase more Poll Pads, not more BMDs. [Doc. 149-1, pp. 25-26]. His only other option is to reallocate equipment in such a way that results in eight

polling locations having only a single check-in unit, which even Dr. Yang acknowledges is "not an ideal situation." [Doc. 149-1, p. 26].

In other words, Dr. Yang runs straight into the same policy decisions made by Gwinnett election officials that Plaintiffs ask this Court to second-guess. But beyond Dr. Yang's ideas, Plaintiffs can point to no basis on which this Court can rest the policy decision of the number of Poll Pads and scanners for each of the 30 precincts about which Plaintiffs are concerned. [Doc. 148, pp. 10-11]. Federal judges should not extend their sphere of decision-making "to second-guessing and interfering with a State's reasonable, nondiscriminatory election rules." *New Ga. Project v. Raffensperger*, No. 20-13360-D, 2020 U.S. App. LEXIS 31405, at *14 (11th Cir. Oct. 2, 2020). Plaintiffs have provided no basis for this Court to second-guess the determinations of Georgia election officials regarding the allocation of Poll Pads and scanners for the November 2020 election.

### IV. Plaintiffs misapply *Anderson/Burdick*.

In order to apply *Anderson/Burdick*, Plaintiffs must identify the election practice that burdens the right to vote. *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). While long lines may be a symptom of a problematic election practice, Plaintiffs have apparently now narrowed the potential causes of those lines to an alleged failure "to supply and allocate voting machines at

polling locations to reduce lines to 30 minutes or lower." [Doc. 148, p. 26]. Plaintiffs also urge that this is a "severe" burden on the right to vote. *Id*.

In considering how much of a burden any particular election practice may be, this Court must weigh the "numerous avenues to mitigate chances that voters will be unable to cast their ballots." *New Ga. Project*, 2020 U.S. App. LEXIS 31405, at *7-*8. Georgia voters have a variety of options besides Election-Day voting that lessens the overall burden, even if lines occur at precincts on Election Day.

Again, if Plaintiffs wish to challenge county decisions about machine allocation that they claim violate Georgia statutes, they can do that in superior court. But Plaintiffs have not provided a basis on which this Court can conclude that the decisions of Gwinnett Defendants about machine allocation have placed any burden on the right to vote of any Gwinnett-County voter. Without that showing of a burden—or if there is a burden, the extremely light nature of that burden—the County's regulatory interests in operating an election more than account for any slight burden on the right to vote. *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358, 117 S. Ct. 1364, 1370 (1997).

## CONCLUSION

Early voting begins on Monday. Logic and accuracy testing and machine programming for November is underway right now. The Supreme Court "has repeatedly emphasized that lower federal courts should ordinarily not alter the election rules on the eve of an election." *Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 140 S. Ct. 1205, 1207 (2020). Plaintiffs have shown no basis why this Court should treat this case any differently, especially when "we are in the middle of" the election. *New Ga. Project*, 2020 U.S. App. LEXIS 31405, at *11. This Court should deny Plaintiffs' motion for preliminary injunction, at least as to Gwinnett Defendants.

Respectfully submitted this 6th day of October, 2020.

*/s/ Bryan P. Tyson*
Bryan P. Tyson
Georgia Bar No. 515411
btyson@taylorenglish.com
Bryan F. Jacoutot
Georgia Bar No. 668272
bjacoutot@taylorenglish.com
Loree Anne Paradise
Georgia Bar No. 382202
lparadise@taylorenglish.com
TAYLOR ENGLISH DUMA LLP
1600 Parkwood Circle, Suite 200
Atlanta, GA 30339
770.434.6868 (telephone)

*Counsel for Gwinnett Defendants*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing GWINNETT DEFENDANTS' RESPONSE TO PLAINTIFFS' SUPPLEMENTAL MEMORANDUM IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION has been prepared in Century Schoolbook 13-point, a font and type selection approved by the Court in L.R. 5.1(B).

/s/ *Bryan P. Tyson*
Bryan P. Tyson