# IN THE UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| LUCILLE ANDERSON, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION FILE |
| v. ) | |
| ) | NO. 1:20-CV-03263-MLB |
| BRAD RAFFENSPERGER, et al., ) | |
| ) | |
| Defendants. ) | |

## STATE DEFENDANTS' RESPONSE TO COURT'S INQUIRY ON PLAINTIFFS' EQUAL PROTECTION CLAIM

Defendants Secretary of State Brad Raffensperger and the State Election Board Members (collectively, "State Defendants") submit this brief Response to the Court's Inquiry on Plaintiffs' Equal Protection Claim. In its October 8 order, the Court provided the State Defendants with the opportunity to file "any evidence they want the Court to consider in the event the Court is required to apply the Anderson-Burdick test to Plaintiffs' equal protection claim (Count III). *See Wexler v. Anderson*, 452 F.3d 1226, 1231-33 (11th Cir. 2006) (applying Anderson-Burdick to equal protection claim)." This Brief is responsive to the Court's request.

This Court's inquiry focuses on the *Wexler* decision, which involved challenges to Florida's recount regulations. The recount rule created two processes for recounting votes depending on whether votes were cast in counties that used

optical scanner machines (bubble-in-the-blank) or touchscreen machines. 452 F.3d at 1228-29. The court said that the dispositive question for Equal Protection purposes was whether "voters in touchscreen counties [are] less likely to cast an effective vote than voters in optical scan counties." *Id.* at 1231. This question required consideration of the Florida election law and varieties in "voting system[s]." *Id.* at 1232, 1233. The Eleventh Circuit recently described *Wexler* as involving claims that a Florida "statute … create[s] the risk that some votes will go uncounted or be improperly counted." *Jacobson v. Florida Sec'y of State*, 19-14552, 2020 WL 5289377, at *18 (11th Cir. Sept. 3, 2020) (citing *Wexler*, 452 F.3d at 1232).

As noted by this Court, the *Wexler* court applied the *Anderson-Burdick* analysis to the plaintiffs' Equal Protection claim and upheld Florida's recount regulation. The panel decided that the state election law was "'reasonable [and] nondiscriminatory' … [so] the 'State's important regulatory interests are generally sufficient' to sustain' the regulation." *Wexler*, 452 F.3d at 1232 (citing *Burdick v. Takushi*, 504 U.S. 428, 434 (1992)). This was, in part, because the plaintiffs "did not plead that voters in touchscreen counties are less likely to cast effective votes due to the alleged lack of a meaningful manual recount procedure in those

counties." *Id.* In the light of this analysis, State Defendants offer the following analysis and evidence.

### 1. **Plaintiffs' Equal Protection Claim.**

Plaintiffs' Equal Protection theory is that the State arbitrarily and through disparate treatment "value[s] one person's vote over that of another." (Dkt. 1 at ¶ 212 (citing *Bush v. Gore*, 531 U.S. 98, 104-05 (2000)). They contend that complying with Equal Protection requirements mandates "'specific rules designed to ensure uniform treatment.'" (*Id.*) Plaintiffs also contend, in their preliminary injunction brief, that the "disparate allocation of resources among the state and within the counties, as well as the significant racial disparity, constitutes a violation of equal protection." (Dkt. 92-1 at 26.) Throughout this litigation, however, Plaintiffs have failed to identify a single statute or rule that either fails to ensure uniform treatment or discriminates against voters in any way.

When the State Defendants pointed this out, Plaintiffs pointed to *Wexler* but still focused on an alleged and unidentified "non-uniform voting practice" that leads to variances across county lines. (Dkt. 112 at 29 (citing *Wexler*, 452 F.3d at 1231-32); 92-1 at 26.)[1] Plaintiffs also have not articulated how the State

---

[1] This Brief cites to ECF numbers for pinpoint citations.

-3-

Defendants were involved in the allocation of resources "within the counties" about which they complain. (Dkt. 112 at 29.)

### 2. **<u>Plaintiffs' Burden</u>**.

Under these circumstances, Plaintiffs have failed to "clearly" meet their burden of proof and persuasion on the preliminary injunction. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). On the motion to dismiss, Plaintiffs failed to articulate a necessary element of their Equal Protection claim: identifying a state election law or policy that burdens voters. As held in *Jacobson*, courts must "'identify a burden before [courts] can weigh it." 2020 WL 5289377, at *18 (citing *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 205 (2008) (Scalia, J., concurring in the judgment)). Plaintiffs have not; they instead cite to a symptom – lines. The legal question, however, turns on what is the policy or practice that causes the lines that burden voters. The inquiry can end on that point alone. In the alternative, any burden must be weighed against only an "important" regulatory interest, because the Plaintiffs have not identified a discriminatory "restriction" imposed by the State. *Wexler*, 452 F.3d at 1231.

### 3. **<u>The State Defendants' Interests.</u>**

In the absence of a specified statute or procedure, the State Defendants continue to shoot in the dark about what their tie is to Plaintiffs' alleged and

speculative injuries.  Out of an abundance of caution, however, and in response to this Court's inquiry, the State Defendants offer the following:

### a. **Voting Equipment Allocation.**

The Secretary provided every county a ballot marking device ("BMD") and affiliated hardware at (i) a ratio of 1/225 voter on the active voting list; or (ii) equivalent to the number of direct recording election ("DRE") machine, whichever is greater.  (Second Sterling Decl. (Exhibit 1), ¶ 3.)  Counties that requested additional voting equipment by the end of August all received it.  (Dkt. 110-5 ¶ 6.)

This is more than would be required under O.C.G.A. § 21-2-367(b)—even if "voting booth" were interpreted as BMD.[2]  The State's interest in upholding this statute—which Plaintiffs still have not challenged as insufficient or unconstitutional—is that it provides a workable number in the light of "cost, the potential value of innovation, and so on."  *Wexler*, 452 F.3d at 1233 (citing *Bush v. Gore*, 531 U.S. 98, 134 (2000) (Souter, J., dissenting)).  *See also Black Voters Matter Fund v. Raffensperger*, 1:20-CV-01489-AT, 2020 WL 2079240, at *4 (N.D. Ga. Apr. 30, 2020) (considering fiscal cost of proposed relief).[3]

---

[2] The Secretary approves of Cobb County's interpretation of O.C.G.A. § 21-2-367(b), which recognizes the textual distinction between a "voting booth" and an "electronic ballot marker."

[3] Of course, the Court should not reach the issue of the State's interest on Code Section 21-2-367(b), because Plaintiffs have failed to introduce evidence that the

b. **Training.**

Plaintiffs have provided no evidence that the State's training efforts are inadequate or unconstitutional. Worse yet, Plaintiffs provided no compelling legal argument that Code Sections 21-2-50(a)(11) and 21-2-70(8)—and the division of training responsibilities between the State Defendants and County Defendants—are unconstitutional.[4] This is dispositive.

In response to the Court's inquiry, the State has an interest in maintaining this division, as county election superintendents can provide innovative training to meet the needs of their poll workers, particularly when the county election officials are far more likely to know them and the unique needs of their county. *Cf. Wexler*, 452 F.3d at 1233 (permitting election system variety). In addition, the cost of requiring the State to directly train numerous county poll workers **during an ongoing election** is simply not feasible under the current environment. (Second Sterling Decl., ¶¶ 4-5.) *See also New Georgia Project v. Raffensperger*, 20-13360-

---

statute imposes any burden. Plaintiffs' own expert testified that the counties have sufficient equipment to prevent lines; he would simply like them to deploy it differently across polling locations. (Dkts. 93-62 and 149-1.)

[4] As this Court has already recognized, Plaintiffs' reliance on the phrase "Chief Election Officer" to the derogation of numerous statutes that proscribe specific county duties is a bridge too far. *See Jacobson*, 2020 WL 5289377, at *12 (deciding the Secretary's designation as the "chief election officer" does not establish traceability).

D, 2020 WL 5877588, at *3 (11th Cir. Oct. 2, 2020) (deciding changes in the midst of an election cannot be reconciled with Supreme Court precedent and burdens states).

        c.     **Technical Support, Provisional Ballots, and Emergency Ballots.**

Plaintiffs have offered no evidence that the technical support provided by the State has been insufficient, nor have they claimed that the technical support now being provided is constitutionally deficient. Indeed, the Secretary has already informed the Court that the election system vendor is "increasing the number of Election Day technicians available, aiming to have a contracted technician available for each polling place." (Dkt. 110-5 ¶ 5.) This has been confirmed by numerous County Defendants. (*See*, *e.g.*, Dkt. 147-1 at ¶ 10; 146-1 at ¶ 6; 143-1 at ¶ 15.)

The State, however, has an important interest in keeping the obligation on County Defendants to provide for adequate technical training. *See* O.C.G.A. § 21-2-300(c). Those interests include cost and allowing counties to right-size any support needed for a given election. *See Black Voters Matter Fund*, 2020 WL 5877588 at *3 (addressing cost). Plaintiffs' own expert agreed during this Court's hearing on October 8, 2020, that counties are best suited to decide questions of polling location voting logistics.

The same is true about the regulations governing the number of provisional ballots and emergency ballots that must be on-hand at a polling location. *See* Ga. Comp. R. & Regs. 183-1-12-11(c) (emergency paper ballots) 183-1-12-.18(3) (provisional ballots). These rules were developed by a working group that included members of the State Election Board, Secretary of State's office, and various county election officials. The rule went through the notice and comment process required by Georgia law and other stakeholder comments were considered. (Second Sterling Decl., ¶ 6.) They represent deliberate and thoughtful policy choices that the Plaintiffs have not alleged to be unconstitutional or constitutionally deficient; Plaintiffs simply prefer a different minimum number of ballots as a policy matter.

The State has important interests in keeping these nondiscriminatory rules. Not having a large amount of extra and unnecessary provisional and emergency ballots floating around polling locations helps in the "conducting [of] an efficient election, maintaining [of] order, quickly certifying election results, and preventing voter fraud." *New Georgia Project*, 2020 WL 5877588, at *4. This is "enough" under *Anderson-Burdick*. *Id.* In addition, the State has fiscal interests in having counties continue to be responsible for equipping these polling locations. Counties will know best the number to provide *and* can bear the costs more equitably than

an enhanced one-size-fits-all minimum requirement that Plaintiffs seek to impose. *See Black Voters Matter Fund*, 2020 WL 5877588 at *3 (addressing cost).

## CONCLUSION

The State Defendants are grateful that the Court provided them with an opportunity to provide evidence in support of their defense to Plaintiffs' Equal Protection Claim. Respectfully, this Court's analysis should not even arrive at that point in the *Anderson-Burdick* analysis, if applicable. The Plaintiffs have failed to identify any state law, practice, or policy that has voters in some "counties less likely to cast an effective vote than voters in" other counties. *Wexler*, 452 F.3d at 1232. In addition to all of the other reasons set forth in the State Defendants' briefing, this Court should GRANT the State Defendants' motion to dismiss and DENY the Plaintiffs' motion for preliminary injunction.

Respectfully submitted this 9th day of October, 2020.

> Christopher M. Carr
> Attorney General
> GA Bar No. 112505
> Bryan K. Webb
> Deputy Attorney General
> GA Bar No. 743580
> Russell D. Willard
> Senior Assistant Attorney General
> GA Bar No. 760280
> Charlene McGowan
> Asst. Attorney General

Ga. Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Josh Belinfante*
Josh Belinfante
Georgia Bar No. 047399
jbelinfante@robbinsfirm.com
Vincent R. Russo
Georgia Bar No. 242628
vrusso@robbinsfirm.com
Carey Miller
Georgia Bar No. 976240
cmiller@robbinsfirm.com
Alexander Denton
Georgia Bar No. 660632
adenton@robbinsfirm.com
Brian Lake
Georgia Bar No. 575966
blake@robbinsfirm.com
Melanie Johnson
Georgia Bar No. 466756
mjohnson@robbinsfirm.com
**Robbins Ross Alloy Belinfante Littlefield LLC**
500 14th Street NW
Atlanta, GA 30318
Telephone: (678) 701-9381
Facsimile:  (404) 856-3250

*Attorneys for State Defendants*

## **L.R. 7.1(D) CERTIFICATION**

I certify that this Brief has been prepared with one of the font and point selections approved by the Court in Local Rule 5.1(C).  Specifically, this Brief has been prepared using 14-pt Times New Roman Font.


*/s/ Josh Belinfante*
Josh Belinfante

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day filed the within and foregoing **STATE DEFENDANTS' RESPONSE TO COURT'S INQUIRY ON PLAINTIFFS' EQUAL PROTECTION CLAIM** with the Clerk of Court using the CM/ECF system, which automatically sends counsel of record e-mail notification of such filing.

This 9th day of October 2020.

*/s/ Josh Belinfante*
Josh Belinfante